**UNITED STATES**
v.
**James M. TOWNSEND.**
**Crim. No. 1050–56.**

United States District Court
District of Columbia.
May 14, 1957.

Joseph A. Lowther, Asst. U. S. Atty., Washington, D. C., for plaintiff.

J. Leon Williams, Washington, D. C., for defendant.

## YOUNGDAHL, District Judge.

The defendant was indicted and tried on two counts, the first charging that on or about September 4, 1956, he had carnal knowledge of a female under sixteen years of age, the second charging that on that date he took immoral, improper and indecent liberties with that same minor female. On February 8, 1957, a jury acquitted him of the first of these charges but convicted him of the second. He has filed motions for a new trial and for judgment non obstante veredicto.

An important part of the prosecution's case consisted of the testimony of a police officer that scientific tests run on the defendant's penis revealed the presence of blood.[1] In his summation, the prosecutor stated, "* * * that test that showed blood on the penis of this defendant is the insurmountable bit of evidence that the defendant can't get around. He sure can't." (Transcript of Record p. 266), and also, "* * * you can talk and you can talk from now until next winter and you still can't explain away those tests that showed blood on this defendant's penis." There were other references made during the summation and the opening statement to the same effect and a review of the entire record demonstrates that the testimony

constituted a most significant part of the case against the defendant.[2] Under these circumstances, in view of the Court's belief that the evidence should have been excluded on the grounds of relevancy and that the obtaining and introduction of the evidence violated the constitutional rights of the defendant, the motion for a new trial will be granted. The motion for judgment non obstante veredicto will be denied.

## I

The facts relating to the evidence in question are as follows: In the late afternoon of September 4, 1956, the 13 year old complaining witness, accompanied by her mother, went to No. 13 precinct and accused the defendant of having had sexual relations with her that afternoon. Four hours later he was arrested and taken to the precinct station house where he remained for approximately one hour. A detective from the sex squad then took him to Police Headquarters. The detective testified that he noticed blood on the defendant's face on the way to Headquarters—and saw him wipe it off with a handkerchief. The detective further testified that he asked him if he had fallen at the precinct and the defendant replied that he had not fallen but had been beaten by a police officer. The defendant repeated this accusation in his testimony and stated, in addition, that there was blood all over him as a result of the beating. No denial or explanation

1. Timely objection was made to the introduction of this evidence. Had the Court determined to exclude it at that time, it would also have been required, *sua sponte*, to declare a mistrial, since the prosecutor's opening statement disclosed the Government's intention to introduce the evidence. At the time the motion was made, some of the factors which contribute to the instant opinion had not yet been clearly developed, and the Court was of the view that the case of McFarland v. U. S., 80 App.D.C. 196, 150 F.2d 593 was controlling. It is also noted that Breithaupt v. Abram, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 was only decided on the preceding day. In the interval the Court has had an opportunity to study the cited cases and the other

relevant decisions at greater length and has concluded that its earlier view was incorrect.

2. The testimony as to the presence of blood on the penis was of particular significance, since there was also testimony that the complaining witness was menstruating at the time of the alleged offense. In addition, it is important to note that the charges evolved out of a report by one of the defendant's friends, for whom the complaining witness had been baby-sitting at the time of the alleged offense, that he had returned to his apartment to find the complaining witness and the defendant (who had been visiting him) missing, and blood on the sheets of his bed.

of the charge was made by the Government, and no officer from the precinct who was present while the defendant was there detained was produced in court.

It is undisputed that upon arriving at police headquarters the defendant washed his hands at the detective's insistence, though there is conflicting testimony as to whether he touched his penis subsequently. There is also conflicting testimony as to whether he had urinated and thus touched his penis while at No. 13 precinct.

From the washroom the defendant was taken upstairs to the laboratory. There he was informed that chemical tests would be run on his penis to determine the presence of blood. The detective, the defendant, and a sergeant who later administered the tests and testified as to the results, are in substantial agreement as to what then transpired. The defendant refused to take the tests and vigorously insisted upon his right to consult his attorney.[3] In fact, in the words of the sergeant who administered the test, the defendant made this request "over and over again." The detective's reply to the request was, "Look, no sense you getting excited." The defendant was not allowed to contact an attorney.

In addition to protesting the administration of the test verbally, the defendant resisted physically, but the detective overcame this resistance by twisting the defendant's arm or arms behind his back.[4] While the defendant was thus held and unable to resist further, the sergeant pulled his trousers down and swabbed his penis with four different patches of cotton, all chemically treated.

At the trial the sergeant who qualified as an expert witness on the subject of blood tests, testified that in his opinion all four swabs indicated the presence of blood on the penis, but that the tests did not indicate from what part of the body the blood had come, whether the blood was animal or human, or even whether the presence of the blood on the penis was of recent origin. The sergeant stated that the answers to such questions can only be determined through the use of specialized equipment. He also said that he did not make any tests of the defendant's clothing, hands, or any other part of his body, because the detective had not requested any such tests.

## II

The Court has some doubt as to whether the challenged testimony was of any probative value. If it was, it was certainly weak, and whatever benefit may have been gained from its admission was more than counterbalanced by the prejudice which was created thereby.[5] In determining the admissibility of evidence of doubtful probative value, courts should not be unmindful of the eventual role the evidence is likely to play in the jury's considerations. Where the challenged evidence constitutes a significant part of the Government's proof, a higher standard of probative

3. The detective testified, "Defendant at that time says, 'I ain't running no test. I want a lawyer.'" At another point in the transcript, the detective quoted the defendant as saying, "Man, I want a lawyer * * * I don't give a damn; I want a lawyer." The defendant stated that he said, "I would like to have an attorney if there is any test to be taken. I want to know my rights in regard to this."

4. In response to the Court's question, "Did you twist his arms behind his back?", the detective answered, "I held his arms behind his back, yes, sir." At another point, he said, "I pinned his arms behind his back." The sergeant stated, "As I remember it, he had one arm twisted behind his back." The defendant testified, "(the detective) was standing beside me and he took my right arm and pushed it up between my shoulder blades."

5. "But relevance is not always enough. There may remain the question, is its value worth what it costs? * * * This balancing of intangibles—probative values against probative dangers—is so much a matter where wise judges in particular situations may differ that a lee-way of discretion is generally recognized." McCormick on Evidence (1954) § 152, pp. 319, 320.

value than might be applied in other circumstances appears desirable.

The weakness in probative value of the evidence here under discussion stems partly from the fact that despite their knowledge of the presence of blood on the defendant's face and handkerchief at the time the tests on his penis were made—blood which the detective appeared to believe came from a "fall" at the precinct—the police failed to make any tests which might have established the source or nature of the blood on the defendant's penis and failed to determine whether there was blood on any other part of his body.

■ Where there is also an unrefuted charge made by the defendant, both at the time of the taking of the tests and the time of trial, that the blood on his person was caused by a beating administered by police officers, this Court could not in good conscience allow its processes to be used for the securing of a conviction based on the presence of such blood. For if, as is not denied, the police assaulted the defendant, any evidence secured as a result thereof would be excludable.[6] So, too, where federal agents by unlawful acts create a situation in which doubt is raised as to the probative value of evidence, it is the Court's view that such evidence should be excluded. For the Court could not tolerate the jeopardizing of any defendant's rights to life and liberty because of the wilful disregard of law enforcement officers for the Constitution of the United States.

Though the Court has thus far dealt only with the question of the reliability of the evidence, there is another basis, equally important, for excluding the challenged testimony. Since the Government may try the defendant again before this Court and since additional testimony may be introduced relative to the issues thus far discussed, the Court believes it would be appropriate to set forth its views concerning the other problems involved.

### III

■ Even were the evidence in question clearly relevant, the Court would be compelled to exclude it because of the methods used to obtain it.[7] Accepting as correct the uncontroverted testimony of the defendant that he was beaten at a police station and was in fear of further attacks and then, as is specifically admitted by the Government, taken to police headquarters in the middle of the night, denied the right to consult an attorney despite repeated requests, seized by a detective, who twisted his arm behind his back to prevent him from resisting further, while another officer removed his pants and underwear and swabbed his penis, this Court does not hesitate to conclude that the defendant was deprived of due process of law under the Fifth Amendment.[8] No matter how

6. In fact the Court would, if necessary, issue an injunction to prevent the officer from testifying as to such evidence in a state court. Rea v. U. S., 1956, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 213. In United States v. Klapholz, 2 Cir., 1956, 230 F.2d 494, 498, the Court construes the Rea case as an "exercise of its [the Court's] asserted power to discipline federal agents" who violate the Federal Rules, 18 U.S.C.A. In Rea the Court said 350 U.S. at page 218, 76 S.Ct. at page 294, "[Federal] policy is defeated if the federal agent can flout them [Federal Rules] and use the fruits of his unlawful act either in federal or state proceedings." See also People v. Cahan, 44 Cal.2d 424, 282 P.2d 905, 912: "Any process of law that sanctions the imposition of penalties upon an individual through the use of the fruits of official lawlessness tends to the destruction of the whole system of restraints on the exercise of the public force that are inherent in the 'concept of ordered liberty.'"

7. Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 210, 96 L.Ed. 183, "It has long since ceased to be true that due process of law is heedless of the means by which otherwise relevant and credible evidence is obtained."

8. In fact even were this a state prosecution involving state officers, the actions described would constitute a violation of due process under the 14th Amendment. Rochin v. California, supra. See fuller discussion, Section VI, infra.

great its relevance, the Court could not permit the admission of evidence secured as a result of so flagrant an abuse of basic rights and liberties.[9]

## IV

Assuming, *arguendo*, that no improper police activity occurred prior to the time the defendant was taken to police headquarters, the factual situation presented is somewhat different. But still we have an individual taken to police headquarters in the middle of the night, denied the right to contact an attorney, and forcibly compelled, despite oral and physical resistance, to submit to the running of chemical tests on his penis.

The Court of Appeals for the District of Columbia has held that an enlisted man may be ordered by his superiors to submit to a physical examination for the purpose of ascertaining the presence of blood on his body.[10] In that opinion the Court, relying on Holt v. U. S.,[11] concluded that the privilege against self-incrimination was inapplicable to physical evidence. The Court stated, "Out of court as well as in court, his body may be examined without his consent."[12] It is upon this case that the Government places its principal reliance.

Without relying thereon, the Court notes that there are at least two significant differences between the instant case and McFarland. In the first place, in McFarland the enlisted man submitted to the examination under orders from a qualified and appropriate authority. In the second place, no physical coercion was involved. In addition, the decision does not indicate what types of tests were performed on what part of McFarland's person. Assuming *arguendo* that the sentence from McFarland quoted above still represents valid law and an individual's body may be examined without his consent, it does not follow that such an examination may be made in any manner the arresting officer desires. Nor does McFarland state that force may be used to compel disclosure of physical evidence. In fact, it does not purport to deal with the procedures to be utilized when an individual refuses to take a physical examination. Different fact situations may well call for different

---

9. "It is vital, no doubt, that criminals should be detected, and that all relevant evidence should be secured and used. On the other hand, it cannot be said too often that what is involved far transcends the fate of some sordid offender. Nothing less is involved than that which makes for an atmosphere of freedom as against a feeling of fear and repression for society as a whole." Dissenting opinon of Justice Frankfurter, Harris v. U. S., 331 U.S. 145, 173, 67 S.Ct. 1098, 1112, 91 L.Ed. 1399. "If law enforcement were the chief value in our constitutional scheme, then due process would shrivel and become of little value in protecting the rights of the citizen. But those who fashioned the Constitution put certain rights out of reach of the police and preferred other rights over law enforcement." Dissenting opinion of Justice Douglas, Breithaupt v. Abram, 352 U.S. 432, 442–443, 77 S.Ct. 408, 414.

10. U. S. v. McFarland, 80 App.D.C. 196, 150 F.2d 593.

11. 218 U.S. 245, 252–253, 31 S.Ct. 2, 654 L.Ed. 1021, "A witness testified that the prisoner put it [a blouse] on and it fitted him. It is objected that he did this under the same duress that made his statements inadmissible, and that it should be excluded for the same reasons. *But the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material.* The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof. Moreover, we need not consider how far a court would go in compelling a man to exhibit himself. For when he is exhibited, whether voluntarily or by order, and even if the order goes too far, the evidence, if material, is competent. Adams v. New York, 192 U.S. 585, 24 S.Ct. 372, 48 L. Ed. 575." (Emphasis supplied.)

12. See Annotation, 96 L.Ed. 194, quoting above sentence and commenting thereon, "However, this statement seems too broad."

remedies under such circumstances.[13] When, as in·this case, the examination involves chemical tests run on the most private part of an ·individual's body,.the most scrupulous observation of propriety and decency is certainly required.

## V

■ Both the Holt and the McFarland cases are based on the theory that the ·self-crimination provision of the Fifth Amendment is inapplicable to the compulsory disclosure of physical evidence. However, considerable doubt has been cast upon the validity of this proposition by Rochin v. California.[14] In that case the Court said, "It would be ·a stultification of the responsibility which the course of constitutional history has cast upon this Court to hold that in order ·to convict a man the police cannot extract by force what is in his mind but can extract what is in his stomach.

*"To attempt in this case to distinguish what lawyers call 'real evidence' from verbal evidence is to ignore the reasons for excluding coerced confessions.* Use of involuntary verbal confessions in State criminal trials is constitutionally obnoxious not only because of their unreliability. They are inadmissible under the Due Process Clause even though statements contained in them may be independently established as true. Coerced confessions offend.the community's sense ‚of fair‚play and decency." (Emphasis supplied.)[15]

Although in Rochin the majority of the court was applying. the due process doctrine of the 14th Amendment to a state prosecution and thus was not directly interpreting the self-crimination provision,[16] the Court's reasoning appears equally applicable to the latter. Self-criminatory evidence obtained by compulsion is excluded not only because of its unreliability but also because the use of such evidence is offensive to our sense of justice. It is the Court's view that physical evidence can no longer be said with certainty to be totally outside the self-crimination protection.[17]

## VI

■■ The courts have utilized various theories for reaching the result which is so clearly dictated by the facts in this ·case. One of these has been discussed in

13. Breithaupt v. Abrams, supra, 352 U.S. at pages 435, 437–438, 77 S.Ct. at page 410, "[T]here is nothing 'brutal' or 'offensive' in the taking of a sample of blood when done, as in this case, under the protective eye of a physician * * *". "This is not to say that the indiscriminate taking of blood under different conditions, or by those not competent to· do so may not amount to such 'brutality' as would come under the Rochin rule."

14. 1951, 342 U.S.· 165, 72 S.Ct. 205.

15. Ibid. 342 U.S. at page 173, 72 S.Ct. at page 210.

16. Self-crimination as such is not applicable to state prosecutions, Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903. But coerced confessions are considered violative of the due process clause of the 14th Amendment as offensive to a "sense of justice". Brown v. Mississippi, 297 U.S. 278, 285–286, 56 S.Ct. 461, 465, 80 L.Ed. 682. It is to be noted that confessions constitute one form of self-criminatory evidence.

17. See Justice Douglas' concurring opinion in Rochin, supra, 342 U.S. at page 179, 72 S.Ct. at page 213: "Of course an accused can be compelled to·be present at the trial, to stand, to·sit, to turn this way or that, and to try on a cap or a coat. See Holt v. United States, 218 U.S. 245, 252–253, 31 S.Ct. 2, 6, 54 L.Ed. 1021. But I think that words taken from his lips, capsules taken from his stomach, blood taken from his veins are all inadmissible provided they are taken from him without his consent. They are inadmissible because of the command of the Fifth Amendment. [referring to the self-crimination part thereof]." See also Justice Black's concurring opinion 342 U.S. at page 175, 72 S.Ct. at page 211, "I think a person is compelled to be a witness against himself not only when he is compelled to testify, but also when as here, incriminating evidence is forcibly taken from him by a contrivance of modern science. Cf. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746; Counselman v. Hitchcock, 142 U.S. 547, 562, 12 S.Ct. 195, 197, 35 L.Ed. 1110;·Bram v. United States, 168 U.S. 532, 18 ‚S.Ct. 183, 42 L.Ed. 568; Chambers v.‚ Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716."

the preceding section. If, as suggested therein, self-crimination is applicable to compulsory disclosures of certain types of physical evidence, this case is an appropriate one for the application of that doctrine.[18] Although the Rochin case concerned the pumping of an accused's stomach and thus the various opinions of the justices were cast in terms of the invasion of an individual's internal parts, it cannot be said that there is anything less distasteful or repellant about the examination under discussion here. Nor certainly is it any less an invasion of privacy. It should be noted that this is not a case involving mere physical identification or observation, such as is involved in fingerprinting or requiring a suspect to try on clothes.[19]

■ Another doctrine applied to cases of this nature by federal courts is the rule of exclusion as to evidence obtained in violation of the Fourth Amendment prohibition against unreasonable search and seizure. In United States v. Willis[20] a federal district court held that a stomach pumping participated in by a federal officer constituted an unreasonable search and seizure. Although this Court is not relying upon the doctrine suggested therein, a strong argument can be made that the actions of the officers in this case were violative of the Fourth Amendment of the Constitution as well as of the Fifth Amendment. In this regard, the nature of the physical examination, in its historic accept-

ance, and the method used to conduct it may all be significant in determining its "reasonableness".[21] To apply those criteria to the facts of this case would be to conclude that the performance of the tests constituted an "unreasonable" search and seizure.

■ A further rule of exclusion is that applied to evidence obtained in violation of the Federal Rules.[22] In this regard the Court would like to state that it cannot condone the arrogant and repeated refusal to permit the defendant to attempt to contact an attorney. Rule 5(a) of the Federal Rules of Criminal Procedure specifically provides that a defendant is to be taken before the nearest available commissioner without unreasonable delay, and that he must then be advised of his rights. In this case, though the defendant was not brought before a commissioner until many hours had passed, there may well have been no unreasonable delay. However, the denial of the right to counsel at this stage of the proceedings was a clear violation of the spirit of Rule 5, for the policy established therein is that an accused be advised at the earliest opportunity of his legal rights. If commissioners are unavailable, a delay may be necessary, but in such a case the police should advise the defendant of his constitutional rights. If they fail to do so, that failure may be relevant to the question of the admissibility of any evidence secured during that period.[23] In this case the

18. The Fifth Amendment, not the Fourteenth, is applicable in the District of Columbia. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884.

19. The distinction between the type of physical examination upheld in Holt and the type under consideration has been adequately pointed out in Justice Douglas' concurring opinion in Rochin cited in footnote 17, supra.

20. D.C.S.D.Cal., 85 F.Supp. 745.

21. 25 A.L.R.2d 1413. "And it appears from the recent cases that for the purposes of the federal rule, a violent interference with the accused's bodily integrity in order to secure evidence will be regard-

ed as an unreasonable search and seizure."

22. See footnote 6, supra, for discussion of Federal Court's supervisory authority over federal law enforcement officers and exclusion of evidence for purpose of securing compliance with Federal Rules.

23. Rettig v. United States, 99 U.S.App. D.C. 295, 239 F.2d 916, 923: "Another circumstance to be considered, but only in the event it is shown that earlier arraignment was not possible, is whether the police have given the prisoner the benefit of the advisory statement which the committing officer would give under Rule 5(b)." Ibid, 239 F.2d at page 920:

officers not only failed to advise the defendant of his rights, but precluded him from utilizing the only practicable method of learning them. When law enforcement officers so act, with the purpose of attempting to extract evidence, either oral or physical, their disregard for the spirit of the Rule becomes particularly flagrant and distasteful.

Finally, there is the due process clause of the Fifth Amendment.[24] It is the Court's view that this clause clearly requires the exclusion of the evidence herein involved. Due process in federal criminal convictions is an infrequently utilized provision—for the specific protections of the remainder of the Bill of Rights ordinarily provide sufficient guarantee of the rights of individuals. However, in state prosecutions the situation is different. There the due process clause of the Fourteenth Amendment is of vital importance and is frequently used by the Supreme Court in the exercise of its jurisdiction to review state prosecutions for the purpose of ensuring constitutional rights. In construing due process under the Fourteenth Amendment, the Supreme Court has rendered two recent decisions which shed considerable light on the case under consideration.

The first of these is Rochin, supra. The applicability of that decision has been partly discussed earlier. It is necessary here to mention only that the use of force for the purpose of stomach pumping was called conduct which "shocks the conscience" and "offend[s] the community's sense of fair play and decency." In Breithaupt, supra, the Supreme Court upheld a conviction based on the administering of a blood test to an unconscious defendant. The Court there clearly indicated that it was not considering a case involving the use of force. It said, "The absence of conscious consent, without more, does not necessarily render the taking a violation of a constitutional right; and certainly the test as administered here would not be considered offensive by even the most delicate." [352 U.S. 432, 77 S.Ct. 410.] In a footnote it added, "It might be a fair assumption that a driver on the highways in obedience to a policy of the State, would consent to have a blood test made * * *". Justice Douglas, dissenting, equally clearly pointed out that force was not involved. He said, "As I understand today's decision there would be a violation of due process if the blood had been withdrawn from the accused after a struggle with the police." And Chief Justice Warren, dissenting, construed the Court's opinion as implying that "a different result might follow if petitioner had been conscious and voiced his objection." The Chief Justice also said, "The Court's opinion suggests that an invasion is 'brutal' or 'offensive' only if the police use force to overcome a suspect's resistence." The opinion of the Court in Breithaupt specifically distinguished Rochin on another ground, as follows, "Basically the distinction rests on the fact that there is nothing 'brutal' or 'offensive' in the taking of a sample of blood when done, as in this case, under the protective eye of a physician. * * * The blood test procedure has become routine in our everyday life. It is a ritual for those going into the military service as well as those applying for marriage licenses. Many colleges require such tests before

---

"* * * the McNabb rule operates as a sanction against police irregularities that create an *opportunity* for third degree methods by compelling an accused to face his questioners incommunicado, *uncounseled, and uninformed of his rights.*" (Emphasis supplied in part.)

24. "The due process clause (Fifth Amendment) supplements the specific procedural guarantees enumerated in the Sixth Amendment and in preceding clauses of the Fifth Amendment for the protection of persons accused of crime." The Constitution of the United States, Analysis and Interpretation, Legislative Reference Service of the Library of Congress, Edward Corwin, Editor, p. 847 (1952).

permitting entrance and literally millions of us have voluntarily gone through the same, though a longer, routine, in becoming blood donors. Likewise, we note that a majority of our States have either enacted statutes in some form authorizing tests of this nature or permit findings so obtained to be admitted in evidence. We therefore conclude that a blood test taken by a skilled technician is not such 'conduct that shocks the conscience' ".

To quote the above is to distinguish Breithaupt from the instant case. For the swabbing of the penis by law enforcement officers is by no means standard operating procedure for those in any walk of life. The use of force by police officers to compel an individual to submit to such an invasion of his privacy is certainly conduct which "shocks the conscience" and is highly "offensive". It is the Court's view that Rochin and Breithaupt read together require the conclusion that were this a state prosecution and the defendant protected by the due process clause of the Fourteenth Amendment, his rights would have been violated by the actions of the officers in this case.

 However, the standard to be applied in this case is the due process clause of the Fifth, not the Fourteenth, Amendment.[25] The due process clause of the Fourteenth Amendment, as applied by the Supreme Court, does not serve as the basic protection of the rights of defendants in State criminal trials. That function is reserved to the States.[26] The due process clause as applied to state

cases by the Supreme Court serves only to provide a check on state action, to prevent convictions based upon conduct which "shocks the conscience", which is "offensive" or "brutal".[27] However, due process under the Fifth Amendment, along with the other guarantees of the Bill of Rights, when applied by federal courts, does serve as the basic protection of the citizen against unjust federal action.[28] In such cases there is neither an intervening state court system nor an intervening state constitution. It is, therefore, the Court's view that Fifth Amendment due process must be given an even broader connotation than Fourteenth Amendment due process. However, it is unnecessary here to discuss at any greater length the nature of the Fifth Amendment provision. Suffice it to say that even if the Court were incorrect in its view that the forceful extraction of the evidence here involved would be violative of the Fourteenth Amendment were this state action, the Court would still conclude that, as federal action, it violates the Fifth Amendment.

 The Court would like to add that whether or not it is the force involved which renders the obtaining of evidence of this nature "offensive" when a state prosecution is under federal scrutiny,[29] that element cannot be said to be determinative in cases involving federal action. For, basically, what is "offensive" herein is that the suspect was compelled by police authorities to submit to the tests involved. To say otherwise

25. See footnote 18 supra.

26. "We must be deeply mindful of the responsibilities of the States for the enforcement of criminal laws, and exercise with due humility our merely negative function in subjecting convictions from state courts to the very narrow scrutiny which the Due Process Clause of the Fourteenth Amendment authorizes." Malinski v. New York, 324 U.S. 401, 412, 418, 65 S.Ct. 781, 789, 89 L.Ed. 1029.

27. Rochin, supra.

28. Crain v. United States, 162 U.S. 625, 645, 16 S.Ct. 952, 40 L.Ed. 1097. Also see footnote 24, supra.

29. It is unclear whether such is actually the rule applied in reviewing state prosecutions. Breithaupt, supra, held that an unconscious man could be subjected to a blood test. The majority said that it would be a fair assumption that he would have consented to the test had he been conscious, and thus left open the question of whether the tests could properly have been made over the defendant's non-violent resistance.

**388**

is to say that hardened criminals willing to risk a struggle with the police could successfully overcome the right of law enforcement officers to obtain evidence, while less aggressive suspects, whose resistance stops at the use of force, could be compelled to submit to the identical tests. If such a rule is necessary because of the Supreme Court's asserted limited jurisdiction to review state prosecutions, it is not necessary for the purposes of federal courts determining the constitutionality of actions of federal officers.

### VII.

With the development of new techniques of law enforcement and the progress of scientific knowledge, courts must be constantly alert to the problem of measuring new fact situations against the strict constitutional mandate that the rights of all citizens be guarded. For it is only these rights which stand between the citizens of any country and the police state—a phenomenon not unknown to today's world. In guarding these rights courts are not concerned with the innocence or guilt of the particular defendant, for our system of justice provides that no man may be convicted except by due process of law. But far more is at stake here than the rights of the particular defendant. For the preservation of his rights is of vital importance to all the rest of the community, not only because we are here determining what kind of police procedures are appropriate under our form of government, but because the future rights of all citizens, including the innocent, are established hereby. When courts strike down evidence acquired in a manner held to be unconstitutional, they make available to all law enforcement officers a guide to future conduct. To uphold the challenged evidence in the instant case would be to say that citizens suspected of future crimes may properly be subjected to the same treatment the defendant received in this case. To strike down the evidence is to say that citizens suspected of crimes in the future may not be dealt with in so offensive a manner.