STATE of Minnesota, Appellant,

v.

Joshua William LUSSIER, Respondent.

No. A09–0556.

Court of Appeals of Minnesota.

Aug. 18, 2009.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Donna J. Wolfson, David Brown, Assistant County Attorneys, Minneapolis, MN, for appellant.

James Kamin, Acting Chief Hennepin County Public Defender, Paul J. Maravigli, Assistant Public Defender, Minneapolis, MN, for respondent.

Considered and decided by HUDSON, Presiding Judge; KALITOWSKI, Judge; and MUEHLBERG, Judge.*

## OPINION

HUDSON, Judge.

Appellant State of Minnesota challenges the district court's order granting respondent Joshua William Lussier's motion to suppress evidence of the charged crimes of first-degree criminal sexual conduct and kidnapping. Because the district court erred in determining that exigent circumstances did not justify a warrantless entry and search of respondent's residence and because respondent's squad-car statement was therefore not suppressible as the fruit of an unconstitutional search, we reverse in part and remand. But because the warrantless sexual-assault (SARS) examination of respondent's genitals was not justified as a search incident to a lawful arrest, we affirm in part.

## FACTS

At approximately 2:22 a.m. on October 26, 2008, two Minneapolis Police Department officers were dispatched to 18th Avenue South on a report of a crying, unclothed female. When the officers arrived on scene, the woman, D.L., was naked, wrapped in a blanket, shaking, crying uncontrollably, "obviously terrified," and stated that she had been raped through forced oral sex.[1] D.L. said that the sexual

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

1. An officer testified that D.L. told him:

assault occurred in the garage across the street, pointed to 2801 18th Avenue South, and told the officers that the suspect was in the basement of the residence. She described the suspect as a "fat white guy" in his twenties, with "short, dark hair wearing no shirt, black pants and smelling of alcohol." The officers noted that D.L.'s face had been injured and was bruised and bloody, that she had bruises to her stomach and back, and that she had scrape marks on her arms and legs.

Neighbors came outside and told the officers "that a 23 to 24 year old Native male, who looked 'white,' had been at 2801 18th Avenue South earlier in the evening and had been very intoxicated." The neighbors said the man was named "Josh" and that he commonly stayed at 2801 18th Avenue South. They told the officers that they believed he "would either be inside the garage or inside the residence ... because he was too intoxicated to leave."

The officers approached the garage at 2801 18th Avenue South and noticed that an access door was wide open. They "observed that two chairs had been knocked over outside the access door and that there was females' clothing including a bra, a shirt and a woman's shoe as well as condom wrappers strewn about on the ground as though a struggle had occurred." They also saw a pair of jeans hanging off the garage roof, a "make-shift bed on the floor of the garage," and "what appeared to be blood on the floor adjacent to the bed."

They did not enter the garage to search for evidence, but at least one officer entered the garage to determine if the suspect was inside. He was not.

Based on the statements of D.L. and the neighbors, along with the evidence in the garage, the officers, after approximately an hour on the scene, determined that they "had probable cause to believe that a [criminal-sexual-conduct crime] had occurred and that the suspect was inside 2801 18th Avenue South, possibly destroying evidence." They knocked on two doors to the residence "for approximately 3 to 5 minutes with no response." They did not notice any movement or hear any sounds coming from inside the house. Believing there were exigent circumstances—specifically, the possible destruction of body fluids or other evidence of a sexual assault—the officers forced entry into the residence. They located respondent, who matched the description that D.L. and the neighbors had provided, sleeping on a couch on the main floor of the residence.

The officers arrested respondent and placed him in the back of a squad car. They noted that he had numerous scratches on his chest, stomach, back, arms, and hands, that he had blood on his hands, that his shirt was on inside-out, and that his pants and belt were undone. The officers swabbed respondent's hands to take a sample of the blood because they feared it would be washed or rubbed off. An officer

She said she was visiting a friend at 2801 18th Avenue. She believed he was in the basement. She entered that house, went to a basement, knocked on the door. She was approached by a male, who told her to get out. She said that she didn't have to. He grabbed her by the shirt, he forced her to the ground, and he grabbed her by the ankles and [dragged] her across the floor, took her up a flight of steps and outside, [dragged] her across the ground to the garage of 2801. Once in the garage, [he] laid on top of her. He struck her with his fist a few times. He forcefully removed all of her clothing, he fondled her breasts, touched her vagina, and then he threatened to kill her if she didn't perform oral sex on him. And at that time she complied and performed oral sex on him. . . . He went back into 2801. And then she ran across the street to 2802 and asked them for help. And then the residents at 2802 called the police.

determined that respondent was "under the influence of alcohol," and "not completely sober and also not incoherent."

Respondent was driven to the hospital to undergo a SARS exam, which the officers believed was a lawful search incident to arrest. En route to the hospital, respondent spontaneously told the officer:

> Can I tell you something? ... There was a girl at the house earlier and I had to physically remove her because she was there to see someone who lived in the basement but wasn't home at the time.... I want you to know that I did not have my shirt on at the time.... [I had to] drag her up the stairs and out the door.

The officer asked if respondent had injured the female, and respondent replied, "[N]o, but that is why I have these scratch marks." He asked respondent about the person he had removed, and respondent said she was "a Native girl in her 40's" whom he did not know and had never seen before. Respondent was not given a *Miranda* warning at any time.

At the hospital, respondent's clothing and undergarments were collected for evidence. At 5:00 a.m., his pubic hair was combed, pubic-hair samples were taken, and his cheek, hands, and penis were swabbed.

At the scene, officers immediately searched the residence, but decided to obtain a search warrant for the garage. One officer admitted that they could have obtained a warrant before searching the residence. Inside the house, they found a woman's shoe (matching the other shoe seen in the garage) about a foot away from the couch where respondent was found. The officers secured the outside of the garage while they waited for the warrant. When later searching the garage following issuance of the warrant, the officers seized men's clothing, a pair of women's underwear, a bra, a woman's shoe, two empty condom wrappers, and blood evidence.

Respondent was charged with one count of felony first-degree criminal sexual conduct and one count of felony kidnapping. He moved to suppress the evidence collected during the warrantless search of the residence, the warrantless SARS exam, and his squad-car statement. Following an evidentiary hearing, the district court granted respondent's motion to suppress. The district court found that the officers had probable cause to arrest respondent at the residence because he "was the only person inside the house who matched [D.L.'s] and neighbors' descriptions: an overweight, light-skinned male in his 20's who was intoxicated and had signs of a struggle on his body." But the court suppressed the evidence collected pursuant to the warrantless search of the residence, holding that no exigent circumstances existed because "[t]here is no evidence that [respondent] was capable of or likely to flee" when the officers had reason to believe he was intoxicated and sleeping, "which would not support a theory that he was a quick-thinking, fast-acting evidence destroyer." The district court also suppressed respondent's squad-car statement and the evidence collected pursuant to the SARS exam as "fruits of a constitutionally unreasonable search."[2] Additionally, the district court held that the officers should have obtained a warrant for the SARS exam because it was not a search incident to a lawful arrest and not justified by exigent circumstances. Specifically, the district court held that the results of the

---

**2.** However, the district court found that if the squad-car statement was not suppressible as the fruit of the unconstitutional search of the residence, it was admissible standing alone because it was not interrogational, and therefore, a *Miranda* warning was unnecessary.

SARS exam were not admissible as a search incident to a lawful arrest because respondent "was not being searched for a weapon, and because he was handcuffed and under police observation, he was physically unable to tamper with any evidence of a criminal sexual assault on his body." It also wrote: "With [respondent] secured and observed by the police, it is difficult to imagine what [he] could have done to destroy any evidence that would be the subject of the SARS exam while the police waited to obtain a search warrant for the exam."

Appellant State of Minnesota now appeals the district court's rulings.

## ISSUES

I. Did the district court err in suppressing evidence obtained through the warrantless entry and search of respondent's residence?

II. Did the district court err in suppressing respondent's squad-car statement and the evidence obtained from the warrantless sexual-assault (SARS) examination of respondent's genitalia?

## ANALYSIS

■ "When reviewing a district court's pretrial order on a motion to suppress evidence, we review the district court's factual findings under a clearly erroneous standard and the district court's legal determinations de novo." *State v. Gauster,* 752 N.W.2d 496, 502 (Minn.2008) (quotation omitted). "[W]e will not overturn a pretrial order of the district court unless the state demonstrates clearly and unequivocally that the district court erred in its judgment and that, unless reversed, the error will have a critical impact on the outcome of the trial." *Id.* (quotation omitted); *see* Minn. R.Crim. P. 28.04, subd. 2(2) (stating that state may appeal from pretrial order that will have critical impact on outcome of trial).

## I

■ Appellant argues that the district court erred by concluding that exigent circumstances did not justify the warrantless entry into the residence because the officers reasonably believed that respondent might destroy evidence of the sexual assault by bathing himself and/or washing his clothing. We agree.

■■ The United States and Minnesota constitutions prohibit a warrantless search of a person's home. U.S. Const. amend. IV; Minn. Const. art. I, § 10. Warrantless searches and seizures are per se unreasonable unless permitted by one of a limited number of exceptions, including the presence of probable cause that an individual has committed a felony and exigent circumstances related to its investigation. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *State v. Othoudt,* 482 N.W.2d 218, 223 (Minn.1992). The state bears the burden of showing that at least one of the exceptions applies in order to avoid suppression of the evidence acquired from the warrantless search. *State v. Metz,* 422 N.W.2d 754, 756 (Minn.App.1988).

■ "In order to establish probable cause, the police must show that they reasonably could have believed that a crime has been committed by the person to be arrested." *State v. Paul,* 548 N.W.2d 260, 264 (Minn.1996) (quotation omitted). "The probable-cause standard is an objective one that considers the totality of the circumstances." *State v. Olson,* 634 N.W.2d 224, 228 (Minn.App.2001), *review denied* (Minn. Dec. 11, 2001).

■ Exigent circumstances can be established either by a single factor or by the "totality of the circumstances." *State*

*v. Gray,* 456 N.W.2d 251, 256 (Minn.1990). The following single factors, standing alone, are considered to support exigent circumstances: (1) hot pursuit of a fleeing felon; (2) imminent destruction or removal of evidence; (3) protection of human life; (4) likely escape of the suspect; and (5) fire. *Id.* A warrantless search is permissible "when the delay necessary to obtain a warrant might result in the loss or destruction of the evidence." *State v. Richards,* 552 N.W.2d 197, 203 (Minn.1996).

In *Loftus v. State,* this court held that the search of a criminal sexual assault suspect's apartment and seizure of evidence was justified by exigent circumstances, considering the totality of the circumstances. 357 N.W.2d 419, 422 (Minn. App.1984), *review denied* (Minn. Mar. 6, 1985). A guest in Loftus's apartment watched him enter a female child's room in the middle of the night and heard the bed squeaking and hitting the wall and the child whimpering. *Id.* at 420. The guest took the child out of the apartment and took her to a hospital, where police were contacted. *Id.* at 421. A police officer entered the apartment sometime after 7:30 a.m. without a warrant, arrested Loftus, and seized the child's panties, nightgown, and bed sheet. *Id.* This court concluded that there was a "danger that the clothes would be commingled with other clothes and ultimately washed," and that it was "also reasonable to assume that Loftus knew of his imminent arrest when he awoke in the morning and discovered [that the guest and victim] were out of the house." *Id.* at 421–22; *see also State v. Gant,* 305 N.W.2d 790, 791 (Minn.1981) (affirming district court's denial of motion to suppress evidence obtained through warrantless search of defendant's residence where probable cause indicated that defendant committed violent sexual assaults and exigent circumstances justified search because "time [was] of the essence"

as defendant could have destroyed evidence or fled once he realized he left a wallet at crime scene).

Respondent contends that *Loftus* is distinguishable because, here, the search of the residence occurred at approximately 3:30 a.m. and officers had been told that respondent was sleeping and intoxicated. Thus, respondent argues that, unlike Loftus, he did not know or realize that his arrest was imminent. Combined with the fact that the officers did not notice movements or hear sounds inside the house when they knocked on the doors, respondent concludes that the officers had "no basis . . . to believe [he] was in any condition to bathe, or move methodically about the house identifying and destroying evidence of an assault." In addition, the record indicates that it was possible for the officers to start the process to obtain a warrant to search the residence as early as 6:00 a.m. and that they could have secured the outside of the residence until that time to ensure that respondent did not leave.

But respondent's argument misses the mark. As one officer testified:

People have the opportunity, if given the time, to . . . destroy the evidence by washing themselves off, hiding or destroying clothing, such things like that. And so I guess [it's] time sensitive, what I meant was is that if the evidence isn't secured, people do have the potential or possibility of destroying it.

Another officer stated that "DNA physical evidence . . . could easily be destroyed by washing." And although respondent was sleeping, nothing prevented him from waking up, realizing that numerous officers were outside, and washing his body and his clothing to eliminate body-fluid evidence. It was, therefore, reasonable for the officers to conclude that respondent could have awakened, especially given the fact

that there were at least four officers, the victim (who was crying uncontrollably), neighbors, squad cars, and an ambulance outside the residence. Once awake, respondent could easily have destroyed evidence of the sexual assault.

Appellant also argues that the district court should have applied an objective standard to determine whether exigent circumstances existed, instead of focusing on respondent's state of mind and intoxication. Similarly, appellant argues that whether respondent was sophisticated enough to appreciate his imminent arrest and the concomitant incentive to destroy evidence is irrelevant. We agree with both contentions.

■■■ Caselaw establishes that the correct focus is on a defendant's *capability* of destroying evidence, not whether he or she actually intended to destroy evidence of a sexual assault. *See Loftus,* 357 N.W.2d at 421 (stating that Loftus's friend present in the apartment *"could have* disposed" of evidence "during the delay of time occasioned by obtaining a search warrant" (emphasis added)). Accordingly, the district court's determination here that appellant failed to prove that respondent was a "quick-thinking, fast-acting evidence destroyer" misses the mark because appellant was only required to prove that officers reasonably believed that respondent was capable of destroying evidence. Whether a particular suspect was sophisticated enough to recognize his imminent arrest and the "wisdom" of destroying evidence is irrelevant because officers "cannot be expected to know an individual defendant's proclivities and to adapt their investigative techniques to those characteristics." *People v. Crawford,* 891 P.2d 255, 259 (Colo.1995) (holding that 8:15 a.m. warrantless entry and search of sexual-assault suspect's residence was justified by exigent circumstances where suspect could

have awakened to find that victim had left and, fearing arrest, would destroy evidence).

We hold that exigent circumstances, based on the possible destruction of evidence, justified the warrantless entry into the residence and subsequent seizure of evidence. Accordingly, we reverse the district court's suppression of the evidence seized pursuant to the warrantless entry into respondent's residence.

## II

Because the district court erred in finding that the warrantless search of the residence was not supported by exigent circumstances, we must address the district court's findings regarding respondent's squad-car statement and evidence collected pursuant to his SARS exam, as they are no longer excluded as fruits of an unconstitutional search. *See Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (stating that under the fruit-of-the-poisonous-tree doctrine, evidence is inadmissible if it has been acquired by the exploitation of unlawfully acquired evidence).

### A. Squad–Car Statement

■■■ The district court found that, standing alone, respondent's statement did not violate his constitutional rights because, although he was in custody, the "situation was not interrogational in nature, because [respondent] made the challenged statements spontaneously and voluntarily." Respondent does not challenge that finding. We reverse the district court's finding that respondent's squad-car statement is suppressible as a fruit of an unconstitutional search, and affirm its secondary finding that, standing alone, the

statement is not suppressible.[3]

### B. SARS Exam

▓▓▓▓▓▓ Appellant claims that the warrantless SARS examination of respondent's genitals was a valid search incident to a lawful arrest. We disagree. Under the search-incident-to-arrest exception to the warrant requirement, police may conduct a warrantless search of an arrestee's person and the area within the person's immediate control when the search is incident to a lawful arrest. *Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). The rationale behind the search-incident-to-arrest exception is to ensure officer safety by removing weapons and to prevent the destruction or concealment of evidence. *Id.* at 763, 89 S.Ct. at 2040.

Appellant relies heavily on *State v. Riley*, in which the supreme court held that a warrantless close-range visual inspection of the defendant's penis the day following his arrest was a search incident to a lawful arrest. *See* 303 Minn. 251, 252–54, 226 N.W.2d 907, 908–10 (1975) (where victim of aggravated rape and sodomy told police that assailant had unusual markings on his penis and identified defendant as assailant). Appellant's reliance on *Riley* is misplaced for two reasons. First, while *Riley* is factually similar, respondent here was subjected to a far more intrusive search. We conclude that an examination and collection of evidence from an arrestee's genitals, involving physical touching, goes sig-nificantly further than a visual inspection and involves a greater privacy interest. *See United States v. Townsend*, 151 F.Supp. 378, 384 (D.D.C.1957) (stating that examination of suspect's penis and testing for blood evidence following arrest for sexual assault requires "the most scrupulous observation of propriety and decency"); *State v. Gammill*, 2 Kan.App.2d 627, 585 P.2d 1074, 1077 (1978) (holding that warrantless plucking of 20–25 pubic hairs from suspect following arrest for sexual assault was not justified as search incident to lawful arrest where "manner of extraction was a needless indignity visited upon the defendant"). Moreover, no binding authority expressly permits a warrantless SARS examination following a lawful arrest.

Second, neither justification for the search-incident-to-arrest exception—officer safety and preservation of evidence—was present here given that respondent was handcuffed and was under constant police observation. Accordingly, we conclude that because respondent was restrained and observed by officers at all times, the warrantless collection of evidence from his genitals was not justified by the need to preserve evidence. *See Arizona v. Gant*, —— U.S. ——, ——, 129 S.Ct. 1710, 1716, 173 L.Ed.2d 485 (2009) ("If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply.").

---

**3.** Police are required to give a *Miranda* warning during custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *State v. Hince*, 540 N.W.2d 820, 823 (Minn.1995). "Interrogation" in this context refers to express questioning, as well as "any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. In-nis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). But the mere possibility that police words or actions will elicit an incriminating response is insufficient to constitute interrogation; the words or actions "must reflect a measure of compulsion above and beyond that inherent in custody itself." *State v. Tibiatowski*, 590 N.W.2d 305, 310 (Minn.1999) (quotation omitted).

Additionally, we note that nothing in the record indicates that body-fluid evidence following a sexual assault naturally evaporates or is compromised over time like the dissipation of a defendant's alcohol concentration in driving-while-impaired cases. *See State v. Shriner*, 751 N.W.2d 538, 546 (Minn.2008) ("[T]he rapid dissipation of blood-alcohol content caused by the body's natural processes is a single factor that creates the exigent circumstances in the case of criminal vehicular operation to justify a warrantless blood draw.").[4] And here, the SARS examination took place at 5:00 a.m.; the officers themselves acknowledged that they could have begun the process to secure a search warrant for respondent's residence and thus presumably his body, as well, by 6:00 a.m.

Because of the very intrusive nature of a SARS examination, and because respondent was restrained and under police observation and therefore not capable of destroying evidence, officers were required to obtain a warrant before conducting a SARS examination. *See State v. Fontenot*, 383 So.2d 365, 367 (La.1980) (holding that retrieval of container of drugs from arrestee's vagina was not a search incident to lawful arrest where warrant could have

been obtained within one to two hours and arrestee could have been guarded and preventing from destroying evidence during that time). We hold that respondent's warrantless SARS examination was not justified as a search incident to a lawful arrest, and thus, the district court did not err in ordering the suppression of the evidence collected pursuant to the examination.

## DECISION

The district court erred in suppressing evidence obtained through the warrantless entry and search of respondent's residence and in suppressing respondent's squad-car statement. The district court did not err in suppressing evidence obtained pursuant to the warrantless SARS examination of respondent's genitals.

**Affirmed in part, reversed in part, and remanded.**

---

**4.** At oral argument, appellant's counsel suggested that exigent circumstances existed because respondent could have inadvertently urinated on himself, thereby potentially destroying any body-fluid evidence on his genitals. Similarly, appellant claimed that respondent's perspiration might have inad-

vertently destroyed any such evidence. But appellant put forth no scientific bases for those assertions. Equally important, neither argument was made to the district court. Accordingly, we will not consider these arguments on appeal.