Jesse Eugene **DEARINGER**, Petitioner-Appellant,

v.

**UNITED STATES** of America,
Respondent-Appellee.

No. 71-2806.

United States Court of Appeals,
Ninth Circuit.

Oct. 16, 1972.

Rehearing Denied Dec. 1, 1972.

Paul W. Whelan (argued), of Schroeter, Jackson, Goldmark & Bender, Seattle, Wash., for petitioner-appellant.

Charles W. Billinghurst, Asst. U. S. Atty. (argued), Tacoma, Wash., for respondent-appellee.

Before HAMLIN, HUFSTEDLER and GOODWIN, Circuit Judges.

HAMLIN, Circuit Judge.

Petitioner, Jesse Eugene Dearinger, appeals from an order dismissing, without hearing, his application for relief under 28 U.S.C. § 2255. We summarize the testimony.

On November 21, 1962, three men participated in a bank robbery in Pierce County, Washington. One of them, Weinreich,[1] stayed with the auto, while Shannon[2] and Dearinger entered the bank.

Once inside, Shannon pulled a gun and announced that a holdup was in progress. While he stood guard in the lobby, Dearinger went behind the tellers' cages and collected the money from the drawers.

In the meantime, a customer who was entering the bank saw the holdup in progress. He immediately notified deputy sheriff Durham, who arrived as the two robbers were headed toward the car. When they disregarded his command to halt, Durham opened fire. Shannon fled, with deputy Durham in pursuit. While deputy Durham was engaged in a fruitless pursuit of Shannon, the other two robbers also escaped. The money was subsequently recovered from a nearby field.

On June 14, 1963, Dearinger was arrested. Shannon and Weinreich were also in custody. On the following day, photographs of all three men were published on the front page of a local newspaper in connection with an article which outlined the details of the robbery and identified them as suspects.

Dearinger participated in lineups following the publication of the photographs in the local newspaper. The witnesses who identified Dearinger at this lineup and later in court had all seen the photos and story in the newspaper.

Dearinger was indicted on August 21, 1963. He was tried and convicted of violating 18 U.S.C. § 2113(a) and (d), and sentenced to 16 years imprisonment.

This conviction was reversed on appeal for error in refusing to allow him to call certain alibi witnesses. Dearinger v. United States, 344 F.2d 309 (9th Cir. 1965).[3]

---

1. Weinreich was convicted of the bank robbery in a trial separate from Dearinger's.

2. Shannon pleaded guilty to the bank robbery before Dearinger was first tried.

3. The record shows the following proceedings at the trial:

 " . . . Dearinger's counsel . . . stated, 'I think the record should show

He was retried in the United States District Court in Tacoma in June, 1965. The jury again returned a guilty verdict. The court then sentenced Dearinger to 25 years imprisonment, an increase of nine years over the sentence imposed at the first trial.

Dearinger again appealed, challenging the giving of the Allen charge and the legality of his arrest, and contending that an excessive bail requirement had prejudiced him by preventing him from adequately preparing his case. We rejected his contentions and affirmed. Dearinger v. United States, 378 F.2d 346 (9th Cir. 1967), cert. denied, 389 U. S. 885, 88 S.Ct. 156, 19 L.Ed.2d 183 (1967).

Over five years after his second trial, Dearinger filed his present petition on September 29, 1970. The district judge, after issuing an order to show cause, and after there having been filed a return thereto, denied the petition without hearing.[4] He also in writing denied a petition for reconsideration. This appeal followed.

On appeal, Dearinger raises three broad contentions: (1) It was error for the trial judge to deny him a continuance and thereby force him to trial without the benefit of his alibi witnesses; (2) publication of the photographs in the newspaper prior to the lineup and in court identifications was so unnecessarily suggestive and conducive to irreparable mistaken identification as to be a denial of due process of law; and (3) there was no basis for increasing his sentence from the original 16 years to 25 years on his conviction following retrial.

### I. *Denial of the continuance*

Following the reversal of Dearinger's first conviction, petitioner contends that considerable effort was expended to find certain alibi witnesses and one Wall who owned a gun which was used in the robbery. Wall was subpoenaed, but did not appear.[5] Dearinger, just prior to trial, requested, but was refused, a continuance to search for these missing witnesses.[6]

He contends that denial of the continuance was prejudicial error.

■■ However, "ordinarily a conviction [will not] be reversed solely because an accused could not find a material witness." United States v. Walton, 411 F.2d 283, 288 (9th Cir. 1969). When it is claimed that an error was made in denying a continuance to find such witnesses, the crucial question is whether the defendant was denied a fair trial because, had the witness testified, the defendant would not have been convicted. *Id.*

■ The grant or denial of a continuance is a matter of the trial court's discretion. Leino v. United States, 338 F. 2d 154 (10th Cir. 1964); Smith v. United States, 413 F.2d 975 (10th Cir.), cert. denied, 396 U.S. 932, 90 S.Ct. 273, 24 L. Ed.2d 231 (1969). *Cf.* Dearinger v. United States, 344 F.2d 309 (9th Cir. 1965). To establish that a trial court abused its discretion in denying a continuance there must be some showing as to who was to be called, what he would

that the defendant Dearinger has requested various and several witnesses to be called on his behalf. I have advised against it, your Honor. It is my considered opinion that none of the witnesses that he has requested will add anything to his case or benefit him in any way whatsoever. I want that made a matter of record, your Honor.' "

The District Court refused to permit the witnesses to be called without the consent of the attorney.

4. This ruling was made by the same district judge (Honorable George H. Boldt,

Jr.) who presided at Dearinger's second trial.

All contentions made by Dearinger in this petition were based upon evidence which had been presented in the two previous trials and the appeals therefrom.

5. A bench warrant was issued and, following trial, Wall was cited for contempt.

6. "The motion for continuance was based on his supporting affidavit, stating 'Defendant believes he could produce other witnesses whose whereabouts are presently unknown and who if located would be beneficial to the defense . . . .' "

have testified to, and that such testimony would have been material and relevant. *Smith, supra; Leino, supra.*

■ An examination of the record before us fails to reveal that Dearinger attempted any such showing. Indeed, during the second trial, when the trial court requested such a showing, appellant's counsel admitted that he was himself unsure as to what these witnesses would testify to.

Furthermore, it seems that there was some doubt as to the ultimate availability of these witnesses. Wall, for one, had apparently absconded to avoid testifying. In such circumstances, where witnesses are unavailable, the request for a continuance presents a far different situation than where witnesses can be obtained with little delay. Dearinger v. United States, 344 F.2d 309, 312 n. 5 (9th Cir. 1965).

We find no error in denying the request for continuance.

II. *Effect of the newspaper publication*

Dearinger concedes that, inasmuch as the lineup and in court identification antedated the *Wade* and *Gilbert* cases,[7] he can claim no benefit from those holdings. We also note that the lineups occurred in June, 1963, but that Dearinger was not indicted until August, 1963. Thus, the Wade-mandated right to counsel at the pretrial lineups would not have applied in any case. Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

■ But Dearinger, both in his 2255 petition and on appeal, advances the argument, recognized in *Wade* and other cases, that under certain circumstances a pretrial confrontation may be so unduly suggestive and conducive to irreparable mistaken identification as to deny

the accused due process of law under the Fifth Amendment.

In this case, petitioner contends that the newspaper publication of his photograph in conjunction with a story on the robbery identifying him as an arrested suspect caused the subsequent lineup to be conducted under circumstances so prejudicial as to taint the later in court identifications.[8] Our appraisal of this contention calls for a review of the "totality of the circumstances" under which these identifications were made. Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). *See* Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

The robbery occurred in the middle of the afternoon in a well-lighted modern bank. Although the robbers had made some cursory attempts at disguise, it was obvious to the witnesses that these were merely painted-on imitation sideburns and moustaches. The robbers were inside the bank for at least five minutes. Three witnesses identified Dearinger. They were in close proximity to the robbers. The one identified as Dearinger was so close to one of the witnesses that, at the first trial, he testified that he "could see the bullets" in the cylinder of the gun which Dearinger held. Thus, it seems clear that the witnesses had ample opportunity to obtain a clear impression of the physical characteristics and facial features of the robbers.

In addition to the three eye witnesses in the bank, there was a fourth witness who identified Dearinger as being in the vicinity of the bank just after the robbery.

Moreover, it seems that the photos that were published in the paper did not provide a clear impression of the robbers. One of the bank eye witnesses, a

---

7. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) ; Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

8. There also appears to be some question as to whether Dearinger can advance this argument. No effective objection to this testimony was made at the second trial, nor was the issue raised on this appeal from his second trial. However, as we conclude that no taint resulted from the newspaper publication, we do not reach this question.

Mrs. Colegate, testified at both trials that these photos were confusing, and that it was not until the lineup was conducted that she became certain of her identification. Another witness, a Mr. Johnson, at the first trial explicitly stated that the newspaper photos did not influence his later lineup identification. During the second trial, a third witness, Mr. Matilla, was asked what recollection he relied upon for his in court identification of Dearinger. He replied, "[f]rom the time he came into the bank until he left, I watched him and I wasn't going to forget his face."

The identification witnesses were thoroughly cross-examined at the two trials as to what occurred at the time of the robbery and at any lineup which they attended. A picture of the lineup was introduced in evidence. No facts were developed that indicated that the lineup procedure was in any way unfair.

At the lineup no reference was made to the men by name. Although the newspaper article identified the men by name, they were not so designated at the lineup. Moreover, there was no indication given that any of the men in the lineup were those whose photos appeared in the paper. Thus, there was no substantial basis for the witnesses to infer that the men in the lineup were those men identified as suspects in the newspaper.

After consideration of all the circumstances which were extensively developed by direct and cross-examination in the two trials, we hold that the record discloses no basis to indicate that the prior newspaper publication had any impermissible effect on the later lineups and the in court identifications.

 Aside from this, there was independent testimony from one Richard Pierson in which he stated that Dearinger had admitted his participation in the robbery to him.[9] This was sufficient to sustain the submission of the case to the jury, even without the eye witness testimony.

### III. *Propriety of increased sentence*

We now turn to petitioner's last contention that it was error to increase his sentence from 16 years to 25 years after his second conviction.

In North Carolina v. Pearce, 395 U.S. 711, 726, 89 S.Ct. 2072, 2081, 23 L.Ed. 2d 656, the Supreme Court stated:

" . . . whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal."

The record before us contains no showing of "identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding" which would justify the increased sentence.

 The *Pearce* case was decided in 1969. Five circuits have held it to be retroactive.[10] Following the holding of these cases and the rationale of Desist v.

---

9. Pierson was a somewhat unsavory character who had a record of drug use. However, he had no interest in the outcome of the trial, thus there was no reason for him to falsely incriminate Dearinger. The jury could have, and apparently did, believe him.

10. James v. Copinger, 441 F.2d 23 (4th Cir. 1971) ; Barnes v. United States, 136 U.S.App.D.C. 171, 419 F.2d 753 (D.C.Cir. 1969) ; United States v. Gross, 416 F.2d 1205 (8th Cir. 1969) ; United States v. King, 415 F.2d 737 (6th Cir. 1969) ; and United States v. Wood, 413 F.2d 437 (5th Cir. 1969).

United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), wherein the Supreme Court enunciated the relevant criteria for determining retroactivity, we hold that the interests of justice in this case require that *Pearce* be held retroactive.

■ The judgment of the district court is affirmed in all respects except that the case is remanded to the district court for resentencing in the light of North Carolina v. Pearce, *supra*.

HUFSTEDLER, Circuit Judge (concurring and dissenting).

I concur in the majority opinion except those portions that relate to Dearinger's claim that the in-court identification testimony was tainted by impermissibly suggestive pretrial procedures.

I first dispose of the question whether the issue is foreclosed because Dearinger did not raise it at his second trial or upon his second appeal.[1] His failure to raise the issue cannot be deemed a waiver because the outlines of the constitutional claim did not emerge until Simmons v. United States (1968) 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, a case that came down almost a year after his second appeal was concluded.

*Simmons* held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (390 U.S. at 384, 88 S.Ct. at 971.) When the *Simmons* standard is met, the use of such tainted pretrial identification procedure is a denial of due process of law. (Foster v. California (1969) 394 U.S. 440, 442, 89 S.Ct. 1127, 22 L.Ed.2d 402. *See also* Stovall v. Denno (1967) 388 U.S. 293, 302, 87 S.Ct. 1967.)

Dearinger is not precluded from first raising the *Simmons* issue on collateral attack unless the decision on that point is not retroactive. (*Cf.* Williams v. United States (1971) 401 U.S. 646, 651–655, 91 S.Ct. 1148, 28 L.Ed.2d 388.) There is no basis for limiting retroactivity. If the pretrial identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," it necessarily follows that the use of the evidence "substantially impairs its [the criminal trial's] truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials." (Williams v. United States, *supra*, 401 U.S. at 653, 91 S.Ct. at 1152.) In such circumstances, "the new rule has been given complete retroactive effect." (*Id.*)

The determination whether the pretrial photographic identification procedures met the *Simmons* mark is judged by the "totality of circumstances." (Simmons v. United States, *supra*, 390 U.S. at 395, 88 S.Ct. 967; *cf.* Stovall v. Denno, *supra*, 388 U.S. at 301–302, 87 S.Ct. 1967.) Because I do not think that the majority opinion fully reveals the totality of circumstances in this case, I review the record in detail.

The identity of two of the robbers, Shannon, who entered the bank, and Weinreich, who drove the Chevrolet getaway car, was established. All three men who participated in robbing the bank on November 21, 1962, were disguised with false mustaches, eyeglasses, padding in the mouth, and makeup suggesting heavy brows and sideburns. The two men who entered the bank wore topcoats, hats, and gloves. Shannon stood guard in the lobby as the second man (sometimes identified as Dearinger) went in the back of the tellers' cages and at gunpoint took $13,662 cash from the drawers. The two men were in the bank not more than five minutes. A customer who was entering the bank saw the holdup in progress, immediately found Mr. Durham, a deputy sheriff, next door to the bank, and reported the robbery. Mr. Durham saw the two rob-

---

1. See n. 8 of the majority opinion.

bers headed toward the parking lot. When they failed to halt upon his command, he opened fire. Shannon ran toward the Chevrolet and jumped in. Mr. Durham fired a shot through the rear window. The Chevrolet stopped. Shannon got out of the car and fled, with Mr. Durham in pursuit. Shannon escaped during the chase. While Mr. Durham was engaged with Shannon and the Chevrolet, the second robber ran around the corner of the bank and into the woods. Weinreich and the Chevrolet had disappeared by the time Mr. Durham abandoned his pursuit of Shannon. The bag containing the proceeds of the robbery was dropped by one of the robbers during the flight, and it was recovered from a field the day of the robbery.

On June 14, 1963, Dearinger was arrested and charged with the bank robbery. Shannon and Weinreich were also in custody. On June 15, 1963, mugshots of all three men were published on the front page of Pierce County's leading newspaper under banner headlines. The caption under the photographs was: "BANK ROBBERY SUSPECTS—These three young men have been charged as the robbers who held up the University Place branch of the National Bank of Washington last November 21. They left the bank with $13,662 but discarded their loot in making their escape." The photographs were accompanied by a lead story that recapitulated the circumstances of the robbery and that included the following passages:

" 'This matter has received continuous investigation since the robbery,' said Elgin Olrogg, senior resident agent for the FBI in Tacoma, who filed the charge. The charge was drawn by Assistant U. S. Attorney Charles W. Billinghurst.

"At a hearing before U. S. Commissioner Robert E. Cooper yesterday, a bond of $15,000 was set for Shannon. Bond for Dearinger will be set at a hearing today.

"All three men have extensive records, Olrogg said. . . ." [1a]

Dearinger participated in lineups conducted June 17 and June 18 or June 19, 1963.[2] No lawyer was present, although Dearinger asked for one. The four witnesses who identified Dearinger at trial also identified him as one of the robbers at the lineup. All four witnesses had seen the newspaper pictures and story before they attended the lineups.

Dearinger was identified as the man who went behind the tellers' cages by three witnesses at the trial, Mattila, Johnson, and Colegate, who were eyewitnesses to the robbery. The fourth identification witness, Langlow, did not see the robbery. He saw a man whom he identified as Dearinger a few blocks from the bank, some 10 to 15 minutes after the robbery. The government called three other eyewitnesses to the

---

1a. In fact, Dearinger had no prior criminal record. He had had some juvenile proceedings against him, none of the details of which are in the record, other than the fact that the conduct did not amount to a felony.

2. A complete record of the lineups is not available. We cannot determine with certainty which of the identification witnesses attended which lineup. There is in the record photographs of one lineup of six men, including Shannon and Dearinger. In seeking 2255 relief, Dearinger filed an affidavit challenging the fairness of the lineup. Among other things, he said that the lineup members were obliged to state their names, addresses, criminal records, and charges against them. The police chief of Tacoma filed a counteraffidavit in which he admitted that that procedure was used in "morning lineups" of new prisoners conducted for the benefit of law enforcement officers. He also said that police records showed that Dearinger appeared in a lineup on June 17, 1963, "presumably a morning lineup." There was, he said, no record of the identity of the officer who conducted that lineup. The police chief also said that police records showed that a lineup was conducted on June 18, 1963, at 1:50 p. m. attended by several bank employees. No evidentiary hearing was held to resolve the conflicts in the affidavits.

robbery. None of them was able to identify Dearinger as one of the robbers from photographs shown to them shortly after the robbery, or at the lineups, or at trial.

Mr. Mattila first saw the robber, whom he identified as Dearinger, when the robber pointed a gun at him and demanded the cash. He was "real scared." He had an opportunity to observe the robber not more than two minutes. When he was questioned immediately after the robbery about the robber's description, the details eluded him; for example, he said that the robber did not wear glasses. Later, law enforcement officers showed him cast-off garments and glasses that they indicated had been worn during the robbery and Mattila then recalled that his assailant wore eyeglasses. Two days after the robbery Mattila was shown a series of 25 photographs. He selected four of them which he said were similar to the robber who held a gun upon him. The photographs were of four different men. He did not pick out Dearinger's picture. Mattila saw the photographs and newspaper account and discussed them with his fellow witness Johnson before they attended the lineups. Mr. Mattila at the lineups positively identified Dearinger as his assailant. By the June 1965 trial, he was able to give a detailed description of the robber, although he could not give a similarly detailed description of the men other than Dearinger and Shannon in the lineup.

Mr. Johnson, a bank clerk, identified Dearinger at trial. On the date of the robbery, however, he could not give any positive description of the robbers. He said he thought he could identify them, "but not in regard to any . . . a lot of definite physical features." He, too, was shown the series of photographs two days after the robbery, and he was unable to identify Dearinger or

anyone else as one of the participants. At the lineup, Johnson said he was sure that Shannon was one of them, but he could not be sure about Dearinger because he did not get a good look at the man who went behind the tellers' cages.

Miss Colegate, a teller, at trial said that she had a very good look at the man who went behind the cages, and she positively identified Dearinger as that man. However, she had been unable to pick out the pictures of any robbers from the series of photographs displayed to her two days after the robbery. After she saw the newspaper photographs and the story, she went to the lineups.[3] At the lineup, she identified Shannon as the man who took the money from the tills (the one she had been particularly careful to study) and Dearinger as the confederate in the lobby of the bank.

Langlow was never in the bank during the robbery. He testified that he was driving his car near the bank the day of the robbery. As he approached the bank, he noticed "a great deal of hubbub." "The sheriff's deputy came around the corner with a gun in his hand." Mr. Langlow parked his car and talked to a friend for 10 or 15 minutes. He then drove about two and a half blocks from the bank, driving about 20 miles per hour, at which point he saw a man "in pants and a pink shirt, stained knees, come to the side of the road and looking both directions rather furtively." He drove about 150 feet farther, made a U-turn, parked his car, and watched the man making "a half-dog trot" as he disappeared behind some buildings, a period of "half a minute." (There was evidence that one of the robbers wore a pink shirt.) About a month after the robbery, Langlow was shown 12 photographs. He selected a picture as that of the man he had seen in the pink shirt. The officer told him that the photograph was of Dearinger. At the lineup, Lang-

3. She testified that the pictures in the paper confused her, and "one wasn't the defendant." In fact, the newspaper photographs were of Dearinger, Shannon, and Weinreich.

low identified Dearinger as the man he had seen. He too had read the press publicity before he attended the lineup.

The only evidence that linked Dearinger to the robbery, other than the testimony of these four witnesses, was the testimony of a young morphine addict, Pierson, who said that he had seen Dearinger on the day of the bank robbery and that Dearinger had told him that he had dropped the money and that people had shot at him. He also said that Dearinger was wearing a pink shirt. Pierson was seriously impeached, not only by his admitted narcotic addiction and by his prior felony record, but also by his demonstrated failure to remember when he had seen Dearinger in relationship to the robbery. He testified, for example, that he had heard about the bank robbery on the radio on the morning of November 21, 1962, the same day he talked to Dearinger. The robbery occurred at 3:00 p. m. on that day.[4]

There are multiple factors that were conducive to misidentification. None of the identifying witnesses had more than two minutes within which to observe the man who they later said was Dearinger. Observations of the robbers were made during a period of high excitement, and, in the case of the bank employees, under the stress of fear. The robbers wore disguises. The eyewitnesses were unable to give detailed descriptions of the robbers when they were questioned on or near the day of the robbery. Half of those witnesses never identified Dearinger as one of the robbers. None of the eyewitnesses to the crime was able to identify Dearinger from photographs shown to them before the newspaper account was published. The lineups themselves were conducted under suspect cir-

cumstances, entirely apart from the antecedent publicity.

The eyewitnesses' identification followed a strikingly similar pattern: At or near the date of the robbery, the witnesses gave confused and uncertain descriptions of the robbers. None was able to pick out Dearinger from the photographic displays. After seeing the newspaper photographs, the witnesses were convinced that they could identify the robbers, and they picked Shannon and Dearinger out of the lineups. Colegate's identification at the lineup was unhesitating, but she mistook Shannon for Dearinger. Johnson was sure about Shannon, but not about Dearinger. By the time of the second trial, all of the witnesses were positive of their identification and were able to give vivid details of Dearinger's features as of the time of the robbery over two years earlier.

Of all of the factors that contributed to a substantial likelihood of irreparable misidentification, none was as crucial as the publication, before the lineups, of the photographs and the story carrying implications of guilt. "[W]here a photograph has been identified as that of the guilty party, any subsequent corporeal identification of that person may be based not upon the witness's recollection of the features of the guilty party, but upon his recollection of the photograph. . . . [No matter how honest the witness is, he may have great difficulty in shutting out from his mind the features of the individual he had seen in the photograph.] The witness's inability to do so is not at all surprising, since the corporeal identification is always closer (and often much closer) in time to the photographic identification than it is to the crime, and since the witness usually studies the photographs far more carefully and for a longer period

---

4. Shannon testified at the first trial implicating Dearinger. At that time Shannon had pleaded guilty and was awaiting sentencing. After Dearinger's conviction, Shannon was sentenced to 10 years imprisonment with immediate eligibility for parole. By the time of the second trial, Shannon was again in prison on a narcotics conviction. He was not called to testify at the second trial.

Weinreich was called to testify. He denied any participation in the robbery.

of time than he was able to study the features of the perpetrator of the crime." (P. Wall, Eye-Witness Identification in Criminal Cases 68 (1965).) The fact that none of the eyewitnesses to the crime recognized Dearinger from photographs until they saw the newspaper story is potent evidence that the basis of their lineup identifications was memory of the newspaper photographs and not memory of their observations of the robbers at the time of the crime.[5] The inference is irresistible that law enforcement agencies released the mugshots to the newspaper. There was no legitimate law enforcement purpose served by releasing the photographs for publication. All of the persons pictured had been charged with bank robbery and were in custody. No lineups had been conducted. Law enforcement officers knew that prior identification procedures conducted with the eyewitnesses had been unsuccessful. Had the officers personally handed these photographs to the eyewitnesses and made the statements to them that were quoted in the paper the procedure would have been in gross violation of Simmons v. United States (1968) 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247. (*Cf.* Foster v. California (1969) 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402.) The violation is no less stark and no less prejudicial when the medium by which the photographs are displayed to the witnesses is the newspaper.

Error in the admission of the tainted in-court eyewitness identification was not harmless beyond a reasonable doubt. The impact on the jury of multiple eyewitness identifications of Dearinger can scarcely be overestimated. "A conviction which rests on a mistaken identification is a gross miscarriage of justice." (Stovall v. Denno, *supra*, 388 U.S. at 297, 87 S.Ct. at 1970.)

I would reverse and remand with instructions to grant relief as prayed.

5. "Of all the danger signals, . . . surely the most ominous, the one most clearly indicating that a mistake may have been made, is that which exists when a witness who identifies the defendant at the trial is found to have previously failed to identify him." P. Wall, op. cit. *supra* at 113.