**UNITED STATES of America,**
**Appellee,**
**v.**

**John Matthew BOSTON and Ernest Moore, Appellants.**

**Nos. 1234, 1235, Dockets 74–1451, 74–1491.**

United States Court of Appeals, Second Circuit.

Argued Aug. 14, 1974.

Decided Dec. 12, 1974.

---

10. 447 F.2d at 903–906.

Stephen M. Behar, Asst. U. S. Atty., E. D. N. Y. (David G. Trager, U. S. Atty., E. D. N. Y., Raymond J. Dearie, Asst. U. S. Atty., of counsel), for appellee.

David W. McCarthy, Mineola, N. Y. (McCarthy & Dorfman, Mineola, N. Y.,

of counsel), for appellant John Matthew Boston.

Gustave Weiss, New York City, for appellant Ernest Moore.

Before OAKES, Circuit Judge, and FRANKEL and KELLEHER, District Judges.*

FRANKEL, District Judge:

Appellants, John Matthew Boston and Ernest Moore, were found guilty by a jury on April 5, 1974, of robbing a federally insured bank, 18 U.S.C. § 2113(a), and of employing deadly weapons in the commission of that robbery, 18 U.S.C. § 2113(d). Both received concurrent sentences of 20 years in prison. Upon the ample evidence, and for the reasons hereinafter outlined, we overrule the several grounds of appeal and affirm the convictions.

## I. *The Robbery*

From the evidence for the prosecution in the five-day trial (no evidence being offered by defendants), the jury was entitled, perhaps substantially compelled, to find the following facts:

Three men, the two appellants and Daniel Washington,[1] robbed the Baisley Park (Queens, New York) branch of the National Bank of North America on the morning of June 2, 1971. The robbery lasted about ten minutes, the perpetrators insisting that the vault be opened after they had robbed the tellers' stations. More than $185,000 was stolen, including $1,000 in twenty dollar bills whose serial numbers had been recorded before they were placed in the vault as "bait money."

The two key witnesses to the robbery were a bank guard, John Jackson, and the branch manager, Joseph Dente. Dente was ordered by Boston to open the vault; he spent three to five minutes with Boston and Moore in the vault area. Jackson was searched by Moore and observed Boston for five minutes during

---

* Of the Southern District of New York and the Central District of California, respectively, sitting by designation.

1. Washington, who pled guilty, was sentenced to 12 years' imprisonment on December 3, 1971. His sentence was reduced to an indeterminate period pursuant to 18 U.S.C. § 5010(b) on March 28, 1972.

the robbery. After the robbers fled, Jackson chased them in his own car and was able to record the license plate number of the getaway car. Jackson, Dente, and other witnesses to the robbery were interviewed within one hour of the robbery by New York City Police Officers and by special agents of the F.B.I. A composite description of the three suspects was broadcast, as was a description of the getaway car. At the trial David Moore testified that he had loaned the getaway car to his brother, appellant Ernest Moore, before the robbery. David Moore explained in his testimony that the vehicle had been loaned to him by his employer a few days earlier.

Other evidence of appellants' guilt is either immaterial to the points on appeal or will emerge as those points are treated in later portions of this opinion.

## II. *The Arrest of Appellant Boston*

Bank guard Jackson, who chased the appellants in his own car until he lost sight of their vehicle "a good distance from the bank," was able to give the police a description of the getaway car and its license plate number. The getaway car was located later on the day of the robbery at a parking lot in Queens, New York, and surveillance was established by the F.B.I. At 2:30 the following morning, a "gypsy" taxicab approached the area where the car was parked. The driver, appellant Boston, got out and walked around the area. While Boston was thus engaged, co-defendant Washington left the taxi and proceeded to the vicinity of the getaway car. Washington looked into the car, threw something at the windshield, and returned to the taxi. Boston, having returned to the driver's seat, turned the headlights of the taxi on and then off, proceeded down the block, and made a U-turn. The F.B.I. agents intercepted the cab on its way back and forced it to stop.

The agents ordered Boston to get out of the cab and to identify himself. He gave a false name, after which the agents asked for identification. Boston gave them his wallet, which contained a driver's license with his true name on it. Boston then admitted his identity, and both he and Washington were placed under arrest.

■ Boston claims that the F.B.I. agents at the scene of the getaway car did not have probable cause either to stop the taxi he was driving or to arrest him. Both contentions are unsound. The agents had been provided with a description of the getaway car and its license plate number. They also had a composite description of the robbers, including their race, height, weight, approximate age, and hairstyle. The appearance of the two men at the scene in the dark of the morning, evidently resembling the descriptions enough to make this a cogent factor in Judge Costantino's determination, followed by their strange and deeply suspicious behavior around the getaway car, justified the stop following the U-turn. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). After Boston had falsely identified himself, his identification papers revealed that his true name was one the officers had received from an informant who had given them two of the robbers' names. The other name from the informant was Washington, the other arrestee.[2] Adding these dramatic facts to those preceding the stop, there was plainly ample basis for the arrest.

## III. *Appellant Boston's Confession*

At the time of his arrest on the morning of June 3, appellant Boston was searched and $1,190 in cash was found in his possession. He was placed in an F.B.I. car, informed that he was being arrested for the June 2 robbery, and twice advised of his rights. At F.B.I. headquarters he was shown an "Interro-

---

**2.** Judge Costantino found probable cause for the arrest "independent of any statements made by an unnamed informant. . . ." Without suggesting the inadequacy of the record to support that determination, we see no need to exclude the informant's report as part of the totality of the information supplying probable cause. United States v. Canieso, 470 F.2d 1224, 1229–1230, 1231 (2d Cir. 1972).

gation Advice of Rights" form, which he refused to sign. He insisted that he was innocent and claimed that he had been hired by Washington to drive him around New York City. Boston then supplied the agents with his address, which was the apartment of his sister, Stephanie Baker.

Four agents were dispatched to the apartment and, after a search of the premises (a subject separately discussed below), they uncovered $80,000 in cash, including $800 in bait money, three National Bank of North America money wrappers, and one of the bank's money straps, which was later found to have Boston's fingerprint on it.

The results of the search were relayed to Boston, who then admitted his participation in the robbery to a special agent but would not identify the third participant. Boston later repeated his confession to an Assistant United States Attorney.

■■ Boston now claims that the circumstances surrounding his confession violated his Fourth and Fifth Amendment rights and that his confession should not have been admitted into evidence. We cannot agree. No question is raised as to the trial court's finding that Boston was given proper warnings as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He contends, however, that his

refusal to sign a written waiver shows he did not waive his right to remain silent. Boston does not urge that the absence of a written waiver automatically bars the admission of a confession. It is clear, in any event, that a written waiver is not required. See, e. g., United States v. Cassino, 467 F.2d 610, 620 n. 30 (2d Cir. 1972), cert. denied, 410 U.S. 928, 93 S.Ct. 1363, 35 L.Ed.2d 590 (1973); United States v. Speaks, 453 F.2d 966, 968–969 (1st Cir.), cert. denied, 405 U.S. 1071, 92 S.Ct. 1522, 31 L.Ed.2d 804 (1972). On the other hand, Boston argues, correctly, that the refusal to execute a written waiver may be taken as an indication that no waiver was intended or freely given. Granting this, the record before us fully sustains the finding of waiver. Boston knew his Miranda rights and exercised them until he was confronted with the results of the search of his apartment and with the realization that he had involved his sister in his illegal pursuits. His decision to talk after that was found by the trial court, "on the basis of the demeanor of the witnesses and the testimony adduced," to reflect no departure from the requirements of Miranda. The finding appears from the record to be fully justified. It is, at any rate, not clearly erroneous. It must be sustained. United States v. D'Avanzo, 443 F.2d 1224 (2d Cir.), cert. denied, 404 U.S. 850, 92 S.Ct. 86, 30 L.Ed.2d 89 (1971).[3]

3. Appellant Boston's sister Stephanie Baker was indicted on June 17, 1971, and charged with receiving bank robbery proceeds and with being an accessory after the fact to armed bank robbery. Before the arrest of appellant Moore, and following a six day suppression hearing before Judge Leo Rayfiel, Boston pled guilty to two counts of the indictment charging armed bank robbery and conspiracy to commit bank robbery, co-defendant Washington pled guilty to one count charging armed bank robbery, and Baker pled guilty to a superseding information charging her with the misdemeanor of possession of robbery proceeds. Baker was sentenced to an eighteen month period of probation, Washington to twelve years' imprisonment, and Boston to twenty years' imprisonment.

On January 7, 1972, Boston sought by letter to withdraw his guilty plea on the ground that his attorney at the time of his plea had

had a conflict of interest. This was based on the fact that his attorney had been representing both Boston and Baker and that Boston had pled guilty in order to help his sister. Judge Rayfiel denied the application after a hearing. On appeal the Government acknowledged the potential conflict, particularly since an Assistant United States Attorney stated that Baker would not have been permitted to plead to the reduced charge absent a guilty plea by Boston. On June 6, 1973, this court reversed and remanded with orders to permit the withdrawal of Boston's guilty plea. Boston v. United States, 2 Cir., 486 F.2d 1393. In light of these developments, Judge Costantino decided to hold completely new suppression hearings even though extensive evidence had been taken by Judge Rayfiel on the several motions to suppress. Since Baker, Boston, and Washington had pled guilty before Judge Rayfiel's hearings

## IV. Photographic Identifications

The third claim on this appeal, urged by both appellants, is that their rights to due process were prejudiced by the use, nature, and timing of photographic identifications. The contention arises from the following facts: Two days after the robbery a local newspaper published a story concerning the arrest of Boston and Washington, along with a picture of Boston. A bank secretary, Hattie Moss, brought a copy of the story into the bank and showed it to Dente. At the hearing before Judge Rayfiel in 1971 Moss testified that she had also shown the story to Jackson. At that time Jackson stated that he had not seen the story or the accompanying photograph. At the hearing in 1973 before Judge Costantino, it was stipulated that Moss did not remember in 1973 having shown the story to Jackson but "she assumed that she showed it to John Jackson as she had shown it to others." Jackson testified before Judge Costantino that he had not seen the story.

An F.B.I. agent went to the bank more than two months after the robbery to show Dente a number of photographs. Dente was shown eight photographs and selected Boston's as depicting one of the robbers. Between the date of this first photo array and the time of the trial, Dente was shown the photos two or three additional times. At the time of the trial Dente could not, independent of the impressions made by the photo arrays, remember the image of the bank robber whom he had identified as Boston.

An agent visited Jackson in August 1971. Jackson also selected Boston's picture as showing one of the robbers. Jackson saw these photographs two more times before the trial.

Six months after the arrest of Moore, in January 1973, a special agent visited Jackson with a photo array of nine pictures, three of which had been shown to him in the array containing Boston's picture and one of which had been in the array containing Washington's picture. Jackson selected Moore's picture as that of one of the robbers.

The agent visited Dente a few days later. Viewing the array shown to Jackson, Dente selected Moore's picture. Without being told directly, Dente assumed that the picture of one of the robbers was included in the pictures being shown him.

Relying on these facts the appellants sought in the court below to suppress the photographic identifications made by the witnesses Dente and Jackson. Taking into account that Boston's picture had appeared in a newspaper prior to the time of the photographic identification, that there had been no lineup, and that several pictures in the Moore spread had been in prior spreads, Judge Costantino concluded from the record as a whole that "the photographic identifications were not so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. . . ." We sustain that conclusion.

 As to the use of photographs rather than a lineup, this court has observed that "prosecutors might well consider whether they would not only better protect the rights of the defendant but save themselves much needless argument if, in a case like this, where the defendant was in custody and there was no time pressure, they would have a properly conducted lineup." United States v. Fernandez, 456 F.2d 638, 641 n. 1 (2d Cir. 1972). The court has not held or intimated, however, that, as the appellants now argue, law enforcement officers must employ a lineup rather than photographs whenever a suspect is in custody and available. Indeed, the court has rejected the argument that it is prejudicial error for the trial judge to deny a de-

---

ended, there were no findings by him on some of the issues later resolved by Judge Costantino. Judge Rayfiel had stated, however, his conclusion that there was probable cause for the arrest of Boston. Similarly, he had found himself "absolutely satisfied" with the evidence defeating the attacks upon the photographic identifications, a subject to which we now turn on the appeal from Judge Costantino's similar determination.

fendant's request for a lineup prior to trial. United States v. Ravich, 421 F.2d 1196, 1203 (2d Cir.), cert. denied, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970). It would seem to follow *a fortiori* that the argument of the appellants before us must fail. And we are not persuaded that the view taken in *Ravich,* seemingly shared in other Circuits which have considered the problem, see United States v. King, 149 U.S.App.D.C. 61, 461 F.2d 152, 155 (1972), should be repudiated.

Coming, then, to the photographic identifications here in question, the appellants complain of the numbers of photographs in the spreads, the use of the photograph that had been published in a newspaper story, and the re-use of some photographs in the spread containing Moore's picture after they had been used in the spread including Boston's. We have considered each of these points *seriatim,* and all of them cumulatively, and rule against the claims that the out-of-court identification procedures were "impermissibly suggestive," Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), or "so unnecessarily suggestive and conducive to irreparable mistaken identification," Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), as to warrant reversal.

▪ Boston's photograph was contained in a spread of eight, Moore's in a spread of nine. While a spread of ten photographs might be preferable, see Sobel, Eye-Witness Identification: Legal and Practical Problems 110 (1972), there is no magic number. Appellants' complaint that there were too few photographs is not substantial. Cf. United States v. Kaylor, 491 F.2d 1127, 1131 (2d Cir. 1973) (nine photographs); United States v. Bennett, 409 F.2d 888, 898 (2d Cir.), cert. denied, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969) (six photographs).

▪ No more impressive is the argument of appellant Moore that the spread from which Jackson and Dente identified him contained four photos that had been in the spreads used previously to identify Boston and Washington. The nature of the asserted prejudice from this is never quite specified. We agree with the Government's suggestion that "the repetition of four photographs would seem to be suggestive only in the sense that the witnesses might be pressured to select one of the faces repeatedly shown them by the F.B.I." [4]

▪ A weightier argument arises from the fact that Boston's photograph was published with a newspaper story of the robbery and was then included in the spread shown to the witnesses Dente and Jackson. Dente was shown the newspaper story by a co-employee of the bank before being called upon to make the identification. Jackson denied having seen it in that interval, but there was contradictory testimony on this and we assume the correctness of the version favorable to Boston. Even so, the case for reversal is not made.

It seems to have been conceded that the photograph used by the newspaper came from law-enforcement sources, but there was no showing (and the defense appears to have attempted none) of whether the source was state or federal. All seem agreed, and we state in any case, that such conduct by officers of the law is not to be condoned. At the same time, the fact having been left perfectly uncertain below, we are scarcely to take it as established that the wrong lies at a federal doorstep. Nevertheless, strictly for the sake of argument, we treat the case as if this were so because it makes no decisive difference. There is no suggestion whatever of purposeful misconduct. More importantly, the timing and character of the photographic identifications weigh heavily against the view that this circumstance made for impermissible suggestiveness. Dente saw the newspaper photograph two days after the robbery, when his memory of Boston was fresh. He identified Boston from the photographic spread, promptly and certainly, two months later. The trial judge was clearly justified in accepting,

**4.** Brief for the Appellee 20.

as he evidently did, Dente's sworn assurance that the viewing of the newspaper had played no part in his identification. Similar time factors apply to Jackson, assuming he saw the newspaper photograph at all, except that he made the identification of Boston four rather than two months after the robbery and newspaper story. Furthermore, the in-court identifications of Boston were made over two years after the newspaper episode and cannot realistically be deemed tainted by that exposure.[5]

Even if the identification procedures were more dubious than we find them to have been, this is a case where "under the 'totality of the circumstances' the identification was reliable" in each instance. Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). As we have mentioned, both Dente and Jackson had long and intense views of the appellants during the robbery. The light was ample. There were no masks or other attempts at concealment. Their identification testimony, subjected to rigorous cross-examination, was properly allowed to go to the jury.

## V. *The Apartment Search*

It is asserted that the search of Stephanie Baker's apartment, where Boston admitted he was living, violated Boston's Fourth Amendment rights. Boston had given the F.B.I. agents his address during the time he was being interrogated after his arrest on the morning of June 3, 1971. Four agents were dispatched to Baker's apartment, arriving at 7 a. m. No search warrant had been sought. Miss Baker remembered that the agents were armed with shotguns. The agents also testified they were armed, but could not recall what weapons they had, if any, in addition to sidearms. After being admitted to the apartment, the

agents asked Baker if she knew Sam Boston. Baker responded that she did. The agents testified that they told her Boston had been arrested for bank robbery and asked her if they could search the apartment. She consented orally, they said, and signed a consent to search form. Miss Baker, who was alone except for her three young children and was clad only in a bathrobe, testified later that she was not aware that she was signing a consent to search form. She said the agents had told her that they could "call somebody and have them give" permission to search the apartment. She did, however, identify the signature on the consent to search form as being hers.

As stated above, the search uncovered suitcases containing more than $80,000, including $800 in bait money, and other incriminating evidence. The results of the search were relayed to Boston, who then admitted his participation in the bank robbery.

Boston argues on appeal that the items seized at the apartment should not have been admitted into evidence because Baker "did not intelligently, knowingly and intentionally consent to a search of the apartment."[6] The question thus presented is one "of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973).

The Government's burden was to show by a preponderance of the evidence that Baker's alleged consent had been "freely and voluntarily given," United States v. Fernandez, 456 F.2d 638, 640 (2d Cir. 1972), quoting Bumper v. North Carolina, 391 U.S. 543, 549, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). There is no claim of misapprehension as to this

---

**5.** Three other courts of appeal which have been presented with cases of publication of suspects' photographs prior to their identification by witnesses have also rejected claims of impermissible suggestiveness centering on this circumstance. United States v. Henderson, 489 F.2d 802 (5th Cir. 1973), cert. denied, 417 U.S. 913, 94 S.Ct. 2612, 41 L.Ed.2d 217

(1974); Dearinger v. United States, 468 F.2d 1032, 1036 (9th Cir. 1972); United States v. Milano, 443 F.2d 1022, 1025–1026 (10th Cir.), cert. denied, 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 258 (1971).

**6.** Brief for Appellant John Matthew Boston 27.

in the trial court. Our review, then, is of facts found from conflicting testimony, having in mind that "[d]etermination of credibility was for the judge who saw and heard the witnesses," United States v. Fernandez, *supra,* 456 F.2d at 640, and that his findings must stand unless shown to be clearly erroneous, United States v. Sheard, 154 U.S.App.D.C. 9, 473 F.2d 139, 146 (1972), cert. denied, 412 U.S. 943, 93 S.Ct. 2784, 37 L.Ed.2d 404 (1973). Applying these principles to the record before us, we uphold the ruling that the search was validated by consent. Cf. United States v. Fernandez, *supra;* United States v. Thompson, 356 F.2d 216 (2d Cir. 1965), cert. denied, 384 U.S. 964, 86 S.Ct. 1591, 16 L.Ed.2d 675 (1966).

Appellants argue other points on their appeal. All have been considered. None require discussion. The convictions are affirmed.

OAKES, Circuit Judge (concurring):

I am of the opinion that bank manager Joseph Dente's admission at trial that he read the newspaper account of the robbery and saw Boston's picture in the paper *after his arrest,* when taken together with Dente's further admission that he, to use the majority's words, "could not, independent of the impressions made by the photo arrays, remember the image of the bank robber whom he had identified as Boston," gave rise to such a substantial likelihood of misidentification that Dente's in-court identification should not have been admitted. The photograph of Boston furnished by law enforcement authorities to the press for publication with the story of his arrest was impermissibly suggestive. The subsequent photo displays to Dente

served to cement that suggestiveness, so as to render his identification testimony inherently suspect.[1] Nevertheless, in light of the other evidence against Boston—the bait money, the testimony of the bank guard and Boston's own confession—I believe the error regarding the admission of the bank manager's testimony to have been harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); United States v. Counts, 471 F.2d 422, cert. denied, 411 U.S. 935, 93 S.Ct. 1909, 36 L.Ed.2d 395 (1973). *See* N. Sobel, Eye-Witness Identification 159–61 (1972).

---

1. The Government maintains that since Dente had "experienced previous bank robberies," he knew the importance of eyewitness identification, and that his "intense" concentration on the robbers evidenced an independent basis for his in-court identification. Dente's own testimony (that independent of the photo arrays he could not remember the robber's image) undercuts this argument. His previous experience, moreover, might indeed have made him less psychologically capable of clear observation and recall, particularly since

it too was a subject of litigation. *See* United States v. Harrison, 460 F.2d 270, cert. denied, 409 U.S. 862, 93 S.Ct. 152, 34 L.Ed.2d 110 (1972). We simply do not yet know enough empirically, much less from the record in this case, to speak authoritatively about the effect of emotional and motivational states of mind upon perception or recall. *See* Levine & Tapp, The Psychology of Criminal Identification: The Gap from Wade to Kirby, 121 U.Penn.L.Rev. 1079, 1103–08 (1973).