**UNITED STATES of America**

v.

**William SHEARD, a/k/a William Nixon, Appellant.**

**No. 71–1250.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 14, 1972.

Decided Nov. 16, 1972.

Rehearing Denied Jan. 31, 1973.

---

3. We expect that this practice will be followed henceforth to avoid a situation in which reversal might be required.

Mr. Bruce J. Terris, Washington, D. C. (appointed by this Court), for appellant.

Mr. John A. McCahill, Asst. U. S. Atty., with whom Messrs. Harold H. Titus, Jr., U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee. Mr. Thomas A. Flannery, U. S. Atty., at the time the record was filed and Mr. Richard A. Hibey, Asst. U. S. Atty., also entered appearances for appellee.

Before WRIGHT, TAMM and WILKEY, Circuit Judges.

TAMM, Circuit Judge:

Appellant, William Sheard, was indicted on February 2, 1970, in connection with the brutal rape-murder of a five year old girl. The indictment included four counts: felony murder, first degree murder, rape, and taking indecent liberties with a minor. Subsequently tried and convicted of felony murder and rape, appellant was sentenced to concurrent terms of twenty years to life on the felony murder count and of ten to thirty years on the rape count. This appeal followed.

I.

On the evening of November 1, 1969, five year old Penny Sellers, together with her older sister Denise, visited the

apartment home of their grandfather, Robert Dennis, at 1333 Harvard Street, N.W., Washington, D.C. As they were wont to do, the girls did not restrict their visit to their grandfather's apartment, but also frequented the rooms of several of the tenants. They visited Sheard's apartment on more than one occasion, playing with his puppy and enjoying the candy he offered them. At approximately 9:30 p. m., when both girls were watching television in the basement apartment of a friend, Penny decided to leave by herself and return to Sheard's apartment to play with his puppy. When considerable time had elapsed and Penny had not yet returned, her grandfather proceeded to the apartment where he was told by Sheard that Penny "had gone up the street with a man." At the grandfather's request Sheard then telephoned the police.

The police arrived at about 11:00 p. m., having been advised to contact "a Sheard" at 1333 Harvard Street. Upon meeting Sheard they were informed by him that a child was missing, that he had telephoned the police, and that he had been the last person to see the child.[1] One hour later the dead body of the girl was discovered amid debris on the floor of a garage behind 1321 Harvard Street. The child's genital area was exposed and bloody; the autopsy revealed that she had indeed been raped, and that asphyxia due to suffocation was the cause of death. The girl's underpants were subsequently recovered in the alley behind 1333 Harvard Street and one of her shoes was found on the back porch of the house next door.

Under instructions from the officer in charge at the time, the police "sealed off" 1333 Harvard Street and initiated a systematic investigation—allowing no one to enter or leave the building, all male occupants were subjected to questioning and a visual search for the presence of blood in their pubic areas. During the course of this procedure two officers knocked on the door to Sheard's apartment and were admitted by him. The officers immediately observed that Sheard had scratches on his face, that he looked as though he had just taken a bath, and that he was wearing fresh but heavily wrinkled clothing. The room was in disarray, candy was strewn about on the floor, and a large damp burned area was evident on the mattress of a bed. One of the officers immediately left to summon his superiors, and upon returning Sheard was subjected to a visual search of his pubic area (apparently there were two such searches, the first being conducted by the officer remaining at the scene before the superiors arrived). Although both searches revealed the presence of what appeared to be blood, testimony as to the two inspections was suppressed, and hence not presented at the trial. The clothing worn by appellant at the time of arrest, a pair of dark green work pants found lying on the top of a hamper located in the room to which the police originally gained entry, the scattered pieces of candy, and a blanket and bedspread found in the basement of the apartment house, were seized.

Sheard was taken to police headquarters where a benzidine test (a chemical test which reacts positively to the presence of the peroxidase enzyme, an enzyme present in blood and a few other substances, notably citrus fruits) was conducted. The test was positive as to his right hand and penis. Chemical analysis revealed the presence of type O blood (Sheard has type A blood; the victim's was type O) on Sheard's jacket, the dark green slacks, the blanket and bedspread, and the victim's dress and slip. Fibers from the bedspread and blanket, which the victim's sister testified to seeing earlier in the evening in Sheard's room, were discovered on the victim's dress and slip, on all of Sheard's seized clothing, and in scrapings from the heads of both Sheard and the victim.

---

1. The arriving officers both testified at the trial to noticing at this time a fresh facial scratch on the appellant.

Essentially all of the above was admitted as evidence at trial. Sheard's defense consisted principally of his own testimony: the scratches on his face were the result of a work injury; he had taken a bath after work; he had never before seen the blanket or bedspread; the burned area on the bed was small and caused by a cigarette; he had never stated that he was the last person to see the victim; and finally, although the victim had indeed approached his room alone, instead of entering she had turned and walked away.

Appellant raises a plurality of issues on appeal, and regardless of whether all are specifically discussed, each has been accorded full consideration. We affirm.

## II.

Prior to the trial, appellant moved to suppress all evidence obtained by the police as a result of their warrantless entry into his apartment, i. e., their observations which brought about his arrest, the inspection of his pubic area, the seizure of the clothes he was wearing, and the seizure of other clothing in the room. The trial judge invalidated only the pubic area inspections, relying upon the doctrine espoused in Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L. Ed.2d 676 (1969).

The trial judge, weighing the admittedly contradictory testimony of the two officers who originally gained entry, held that the "entry complied with the requirements of [18 U.S.C. § 3109] and was consensual," that shortly thereafter probable cause for arrest existed, and that the seizure of clothing was either incident to the valid arrest or a plain view seizure, and valid. Appellant attacks the trial court's determination on four bases: (1) The entry was illegal for failure to comply with 18 U.S.C. § 3109 (1970); (2) the entry was illegal, lacking both probable cause and an effective waiver by the appellant of his constitutional rights; (3) as there existed no probable cause to arrest, the seizure of clothing worn by the appellant at the time of "arrest" was invalid; and (4) the seizure of clothing lying about the apartment, specifically the dark green work pants, was invalid since it was neither incident to an arrest nor in plain view. Thus, there is here raised the "plethora of litigable issues" with respect to the fourth amendment explicated by Mr. Justice Stewart in Coolidge v. New Hampshire, 403 U.S. 443, 476, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), yet the Gordian knot presented to us is really a granny, one not requiring Alexander's cutting edge but rather only a modicum of untangling. For, assuming a valid consensual entry, the issues of § 3109 compliance, probable cause to arrest, and plain view search are easily dispatched; once inside appellant's apartment the police conduct was manifestly proper. If, however, there was neither consent to entry nor § 3109 compliance, the latter two issues become irrelevant and the conviction must be overturned.

Obliging ourselves with a bit of backward housecleaning, we will initially assume consent in order to sweep away those issues dependent thereon, and then in part III of the opinion directly deal with the consent issue itself.

■ Title 18, Section 3109 of the United States Code [2] requires a police officer who has been refused admittance to announce his purpose and authority prior to "breaking" into a house to execute a search warrant. In Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), the validity of entry to make an arrest based upon probable cause but without a warrant was tested by criteria identical to § 3109, and in Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d

2. 18 U.S.C. § 3109 (1970) provides in full:
   The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he *is refused admittance* or when necessary to liberate himself or a person aiding him in the execution of the warrant.

828 (1968), § 3109 was held to apply to nonforcible entry. *See also* Keiningham v. United States, 109 U.S.App.D.C. 272, 287 F.2d 126 (1960). Appellant now asks this court to expand the protection of § 3109 to the type of entry involved in this case, entry made during the investigation of a crime without probable cause either to arrest or search. Whatever the merits of the contention, we are not required to reach it, for effective consent to entry negates the requirements of § 3109. *See* United States v. Harris, 140 U.S.App.D.C. 270, 277–278, 435 F.2d 74, 81–82 (1970), cert. denied, 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 152 (1971).[3]

■ Once inside the apartment the officers possessed probable cause to make the arrest. As the trial judge stated, "[t]he scratches on the man's face, his demeanor, the presence of the candy, the condition of the bed and the room, the recent indications of some bathing or washing, under circumstances of this case, appear to the court to establish probable cause . . . ." The test for probable cause, set out in Bailey v. United States, 128 U.S.App.D.C. 354, 357–358, 389 F.2d 305, 308–309 (1967), is clearly met:

> It has been said that " '[t]he substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' " Much less evidence than is required to establish guilt is necessary. . . . The standard is that of "a reasonable, cautious and prudent peace officer" and must be judged in the light of his experience and training. (Citations omitted.)

■ Appellant additionally challenges the seizure of the dark green work pants lying atop the hamper. The relevant testimony of Officer Shuler at the suppression hearing follows:

> I took the pants that he had on and placed them on the kitchen table that was in the next room there. And by this time, we started looking around the room, there was clothing all over the room;[4] it was just like he had taken things off for the last three months and thrown them here and there and everywhere. And there was a box, I don't know—I thought of it as a hamper at the time and laying on top of the hamper was a pair of green work pants and on closer inspection of these pants, we saw what we thought to be blood on those. We also placed those on the kitchen table.

The Supreme Court has most recently spoken to the question of the nature and scope of the plain view doctrine in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Mr. Justice Stewart, writing for the Court, stated:

> It is well established that under certain circumstances the police may seize evidence in plain view without a warrant. But it is important to keep in mind that, in the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the "plain view" doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.

403 U.S. at 465, 91 S.Ct. at 2037.

■ Where the initial intrusion that brings the police within plain view of an article of evidence is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, *e. g.*, hot pursuit, search incident to arrest, or the inadvertent discovery of an incriminating object during a search not

---

3. Although the trial judge, in ruling on the motion to suppress, stated that the entry was both consensual and in compliance with § 3109, finding as we do that the entry was consensual we need not consider the § 3109 application. We note, however, that had the entry not been consensual United States v. Harris, *supra,* would be strikingly similar to the case at hand.

4. The "room" about which Officer Shuler testified was the bedroom to which the officers had originally gained entry.

concerning the accused, the seizure is legitimate. Again, Justice Stewart:

> What the "plain view" cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.

403 U.S. at 466, 91 S.Ct. at 2038.

The evidence submitted at the suppression hearing and uncontroverted by appellant was that clothing was scattered throughout the room to which the officers gained entry, and plainly visible. The dark green pants specifically in question were lying atop a clothes hamper located in that room. Surely the pants were "objects falling in the plain view of an officer who has a right to be in the position to have that view," and as such were subject to seizure. Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968). Accord, United States v. Thweatt, 140 U.S.App.D.C. 120, 433 F.2d 1226 (1970).

Appellant asserts that since "closer inspection" of the pants was required before they could be identified as evidence, this court should not place the seizure within the "plain view" exception. This clearly is incorrect. The type of crime involved, forcible rape and murder, and the very appearance of the defendant, freshly bathed and dressed in wrinkled, clean clothing, rendered every plain view item of clothing scattered about the room potentially critical evidence. We will not hold that because the police engaged in a selective process based on closer observation of the plain view evidence that the seizure was any less valid. As we stated in United States v. Thweatt, supra, 140 U.S.App. D.C. at 125, 433 F.2d at 1231, the policeman "is entitled to cooperation from the courts so that his hands are not tied by rules which are so stringent as to be unworkable."

### III.

At the hearing on the motion to suppress, contradictory testimony was given by the two officers who originally gained entry into appellant's apartment.[5]

---

5. The relevant testimony of Officer Shuler, given at the suppression hearing, is as follows:
   A. We knocked on the door and I said, "We're police officers and that a small child had been killed and we'd like to come in."
   Q. And what happened?
   A. He opened the door and we went in.

   .   .   .   .

   Q. All right. Was there any further conversation with the Defendant?
   A. Yes, I advised him, as I said, that a small child had been killed and that we were checking the pubic area of every male in the house. I advised the subject of his rights and I noticed—do you want me to answer the question as I began   .   .   .

   Q. Where were you standing when you gave the Defendant this information and advised him of his rights as you stated?
   A. Just inside the apartment door.
   Q. What—proceed.
   A. Well, I saw on the Defendant's face when I first came in the door, I saw scratches, small scratches on him, here (indicating the bridge of the nose) on the nose and on the cheek here (indicating by pointing to his right cheek). And he was acting sort of ironic [sic] and very, very cooperative to us. He was like friendly, "Come in, come in, I'd like to do all I can to find out   .   .   ."—well, to that effect, that type of thing. I noticed that he was like he had just taken a bath and

Officer Shuler testified that he knocked on the door and announced that "[w]e're police officers and that a small child had been killed and we'd like to come in." Shuler, initially testifying that appellant's response was something . like "Come in, come in, I'd like to do all that I can to find out," later stated that appellant opened the door, and "he invited us in. I don't remember what his words were, but they were like, come in, or something like that." Both officers were in uniform at the time but neither had drawn his gun. Officer Jones, on the other hand, testified that although they did knock and the door was opened by Sheard, nothing was said by either party prior to entry. Jones in later testimony stated, however, that "I don't remember if he [appellant] said, come in, but I was under the impression that we were to enter the room by his attitude."

was very clean; the clothing he had on was clearn [sic].

Motion Record, vol. 1, at 80–81.

Later, recalled to clarify his earlier testimony, Officer Shuler stated:

Q. Now, who was standing in front of the door prior to any knocking, yourself or Officer Jones?

A. The both of us but I remember knocking.

.  .  .  .

Q. What is the next thing that happened?

A. I told the gentleman that we were police officers.

Q. This is—

A. This is prior to opening the door.

Q. Go ahead.

A. And I advised him that there had been a small child killed and that we would like to come inside.

Q. Now, at this point the door was still closed?

A. He could have opened it while I was talking. I don't remember that to the particulars.

Q. The door was opened?

A. The door was opened for us by him. Yes, sir.

Q. And what happened then?

A. We went inside.

THE COURT: Did he say anything at that moment?

THE WITNESS: He said—Well, he invited us in. I don't remember what his words were, but they were like, come in, or something like that.

.  .  .  .

THE COURT: Did you have your guns drawn?

THE WITNESS: No, sir, we did not.

BY MR. DREW:

Q. You were in uniform?

A. Yes, sir, we were.

Motion Record, vol. 1, at 127–29.

Officer Jones, on the other hand, testified as follows:

Q. Now, prior to knocking on the door, did you or Officer Shuller [sic] say anything? Or did you knock on the door the first thing when you got to it?

A. When we got to it we knocked.

Q. You knocked on the door before you said anything?

A. Yes.

Q. Now, the door was opened, correct?

A. Correct.

Q. Was it opened all the way or part the way?

A. All the way.

Q. And you and Officer Shuller [sic] went in?

A. Yes.

Q. Which one of you went in first, do you know?

A. I don't recall.

Q. After you entered the apartment what was the first thing you said to the defendant?

A. I didn't say anything. I might have made a remark that he had scratches on his face; and at that time Officer Shuller [sic] told me to go get Lieutenant DeMilt.

Q. Well, prior to that time had you or Officer Shuller [sic] said anything to the defendant?

A. No.

Q. Were there no statements made either way?

A. No.

Q. You knocked on the door and the door was opened and you went in, is that correct?

A. That is what I remember; yes.

THE COURT: In other words, you didn't say who you were or why you wanted to come in?

THE WITNESS: Well, it was obvious. We were fully uniformed and when he opened the door Mr. Sheard was very cooperative.

THE COURT: What did he say?

THE WITNESS: Well, he just stepped back. And I don't remember if he said, come in, but I was under the impression that we were to enter the room by his attitude.

Motion Record, vol. 1, at 145–46.

■ The ultimate determination by a trial judge at a suppression hearing as to the issue of consent, whether it be consent to enter or consent to search, is factual in nature. As such, under the guidelines established for this court in Jackson v. United States, 122 U.S.App. D.C. 324, 353 F.2d 862 (1965), that determination must remain untouched on appeal unless it is "clearly erroneous." See Hoover v. Beto, 467 F.2d 516 (5th Cir. 1972); United States v. J. B. Kramer Grocery Co., Inc., 418 F.2d 987 (8th Cir. 1969); Schoepflin v. United States, 391 F.2d 390 (9th Cir. 1968), cert. denied, 393 U.S. 865, 89 S.Ct. 146, 21 L.Ed.2d 133 (1968); Green v. United States, 128 U.S.App.D.C. 408, 389 F.2d 949 (1967); Villano v. United States, 310 F.2d 680 (10th Cir. 1962). A finding is not "clearly erroneous" unless the reviewing court is left with the definite and firm conviction that a mistake has been made—the finding either is not supported by or is clearly against the weight of the evidence, or induced by an erroneous view of the law. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

■ The conclusions by the trial judge as to factual matter should be given utmost deference especially when, as here, there is conflicting testimony. The trial judge, with the advantage of live confrontation and the ability to view the mien of the witnesses, is in a position far superior to that of an appellate court to determine credibility and assess the correspondent weight to be given each witness' testimony. This goes to the very heart of our appellate system, and the respect given to factual determinations is responsible in no small part for the orderly system of appellate review, and justice, that we in all our strivings hope to foster. Discrepancies in the testimony of the two police officers do not require its rejection. As Chief Justice [then Judge] Burger stated in Coates v. United States, 134 U.S. App.D.C. 97, 99, 413 F.2d 371, 373 (1969):

> We have often noted . . . that the fact of inconsistencies among witnesses does not require that the testimony be rejected by a trier or triers of fact, but is simply a factor to be considered.

■ Recognizing the heavy burden shouldered by the prosecution when seeking to show a waiver of specific constitutional rights, Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), we cannot say that the trial judge's decision to accept Officer Shuler's testimony and find the entry consensual is unsupported by or clearly against the weight of the evidence, or based on an erroneous application of the law. On the record there is shown no coercion or duress, and the consent was decidedly more than silent acquiescence. The testimony of both officers, considered in conjunction with appellant's original friendly behavior toward the police in calling and talking with them,[6] amply supports a conclusion that the consent to entry was unequivocal and specific, freely and intelligently given, thus meeting the test enunciated in Judd v. United States, 89 U.S.App.D. C. 64, 66, 190 F.2d 649, 651 (1951).

■ Appellant alleges that the trial judge was mistaken in two specifics regarding the requirements of an intelligent waiver. He argues (1) that he could not intelligently waive his constitutional rights because he did not know, when he allowed the officers to enter his bedroom, that they were under orders and intended to search his pubic area; and (2) that a prerequisite to intelligent waiver of fourth amendment rights is a warning, specifically enumerating one's rights regarding the amendment (parallel to Miranda v. Arizona, 384 U.S. 436,

6. The original friendly behavior does not of itself constitute consent to entry, of course, but is an element to be weighed by the trial judge when considering the conflicting testimony of the officers.

86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)), and that such a warning was not given.

Appellant makes much of the fact that the police subjectively intended to do more than gain entry and talk, that they actually desired to search his pubic area. Had evidence of the pubic area inspections been admitted at trial it undoubtedly would have constituted error (unless the searches were validated as incident to arrest[7]) for appellant's consent went only to the question of entry, not of search. The extent of appellant's waiver was limited by the breadth of the objective manifestations of the police—namely, limited to entry. However, the evidence necessary to establish probable cause was garnered upon entry alone.

The appellant's position, which would make "withholding" of an iota of subjective intent fatal to any waiver of constitutional rights, is unworkable and unacceptable. It seeks to put the judiciary in the position of a clairvoyant, assessing the subjective motives of the officer and engaging in a game of subjective-objective comparison. We frown upon police tactics which can at best be described as "sneaky"—those actions where misrepresentation is used to gain entry, then extensive searches are undertaken supposedly with the dweller's consent. We protect against such not by the adoption of unworkable rules, but by: (1) Recognizing the prosecution's burden in proving a waiver of a constitutional right; (2) requiring that any waiver be unequivocal and specific, freely and intelligently given; (3) limiting each waiver's breadth to objective, measurable standards; and (4) recognizing the duress and coercion concomitant to such tactics. *See* Higgins v. United States, 93 U.S.App.D.C. 340, 209 F.2d 819 (1954); Robbins v. MacKenzie, 364 F.2d 45 (1st Cir. 1966), cert. denied, 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

This court has consistently been a watchdog regarding waivers of constitutional rights. We have yet to hold, however, and specifically refuse to do so here today, that when dealing with fourth amendment waivers a warning paralleling that of *Miranda* is necessary. We are not unaware that with the advent of *Miranda* a movement has been afoot to so require, and that several courts have in fact adopted such a requirement,[8] but we respectfully disagree. Such a fourth amendment warning should no more be an automatic *necessary* element than it should be an automatic *sufficient* one.

Rather than blanket adherence to the equations that "recitation of formula warning equals intelligent waiver" and "intelligent waiver requires formula warning," we opt for a more flexible, more realistic approach. In this opinion we have restated our strong adherence to the requirement of proof of a voluntary and intelligent waiver. The prosecution's burden is an admittedly heavy one. In many instances quite possibly it will not, indeed cannot, be carried absent proof of specific warnings. While the burden remains constant, the requisite evidence necessary to meet it varies with the innumerable variables of each particular situation. Whether consent has been made at a time when the accused is under arrest, whether made when entry has already been gained and a further

---

7. We believe appellee's contention that the searches of appellant's pubic area should not have been invalidated under Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), as they were incident to a valid arrest, might be of some merit. Naturally we need not dispose of such an issue at this time.

8. *See* United States v. Moderacki, 280 F. Supp. 633 (D.Del.1968).; United States v. Blalock, 255 F.Supp. 268 (E.D.Pa. 1966); United States v. Nikrasch, 367 F.2d 740 (7th Cir. 1966). *But see* United States ex rel Combs v. LaVallee, 417 F.2d 523 (2nd Cir. 1969), cert. denied, 397 U.S. 1002, 90 S.Ct. 1150, 25 L.Ed.2d 413 (1970); Byrd v. Lane, 398 F.2d 750 (7th Cir. 1968), cert. denied, 393 U.S. 1020, 89 S.Ct. 625, 21 L.Ed.2d 564 (1969); Gorman v. United States, 380 F.2d 158 (1st Cir. 1967).

search requested, and whether the consent is limited to entry, or given for an extensive search,[9] are among the factors having a significant bearing on the degree and quality of evidence necessary to show a true constitutional waiver. Case by case analysis of each individual situation may be burdensome, but a waiver of a constitutional right is a serious affair, one deserving of our utmost attention.

All of us recognize the liberties secured by the Bill of Rights, and the fourth amendment right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" is cherished among those Rights. We all strive to protect the fourth amendment, to shore its erosion, and to maintain it as the viable protector of individual liberty that the past 200 years have proven it to be. Its might is best protected by our continual focusing on the waiver requirements of *specific, unequivocal, voluntary,* and *intelligent,* thus measuring each purported waiver on its own merits and not on the presence or absence of a formalizable utterance.

Finding no erroneous application of the law and ample evidence supporting the trial judge's conclusion that the entry was consensual, the conclusion cannot be clearly erroneous, and we will not now overturn it.

## IV.

Two additional issues are raised that warrant discussion. In the first of these appellant alleges that the trial judge erred in denying his motion to suppress testimony concerning the benzidine test given to him following arrest. Three separate grounds are cited: (1) The test constituted an invalid search, not being incident to a valid arrest and without a warrant. There is no longer any validity to this argument. (2) He was denied his right to an attorney during the administration of the test. We find the similarity between a benzidine test and a blood test, Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), or a handwriting test, Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), conclusive on this issue. No right to counsel exists, for in the language of United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967), "there is minimal risk that his counsel's absence at such stages might derogage from his right to a fair trial." *See* United States v. Smith, 152 U.S.App.D.C. 229, 470 F.2d 377 (1972). (3) The results of the benzidine test should have been suppressed, even though relevant, because of their lack of probative value and tendency to mislead the jury. Appellant asserts that a benzidine test is reliable only to show that blood is *not* present, for a positive reaction shows only that the peroxidase enzyme is present, and the enzyme is present in substances other than blood. Taking into consideration the specific areas of the body that reacted positively to the test, and the type of substances other than blood that react positively, e. g., citrus fruits and potatoes, we do not feel that the trial judge abused his discretion in finding that the evidence's probative value was not outweighed by the danger of unfair prejudice. Griffin

9. As all of the evidence necessary to obtain probable cause to arrest was in plain view and immediately observable by the police when the door was opened, no search was engaged in prior to the arrest of appellant. *See* Creighton v. United States, 132 U.S.App.D.C. 115, 406 F.2d 651 (1968); United States v. Leal, 460 F.2d 385 (9th Cir. 1972). The limit of appellant's consent, one of entry alone, was not surpassed. This was not a situation where the search was necessary to justify the arrest, and the arrest necessary to justify the search. Johnson v. United States, 333 U.S. 10, 16, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

For an interesting categorization of the consent cases, with emphasis on the evidence necessary to prove a valid constitutional waiver, see the dissenting opinion of Judge Coffin in Robbins v. MacKenzie, 364 F.2d 45, 50 (1st Cir. 1966), cert. denied, 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966).

v. United States, 87 U.S.App.D.C. 172, 183 F.2d 990 (1950).[10]

The second issue relates to the trial judge's refusal to enter into evidence two statements taken by the police on the night of the rape-murder. Henry White, a chronic alcoholic, was found on the night of the crime sleeping in the basement of the apartment next to the blanket and bedspread seized by the police. After some difficulty he was aroused from his sleep, evidently soundly intoxicated, and a pubic area inspection was conducted, failing to show the presence of any blood. White was taken to the police station, where between 4:45 and 5:45 a. m. he gave two statements to the police. The first indicated that he had seen a young girl earlier in the evening when she had come to the basement, while the second denied ever seeing either of the sisters. As to the blanket and bedspread, the first statement indicated that he had brought the blanket from the first floor at about 6:30 p. m., but had not seen the bedspread, while the second statement indicated that he had in fact brought both from the apartment of the girls' grandfather earlier in the evening.

At a hearing to determine his capacity to testify, White on the advice of counsel pled the fifth amendment, which plea was sustained by the trial judge. When appellant then sought to offer one or more of the statements into evidence at trial as declarations against penal interest, the trial judge rejected the evidence, relying both on Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L. Ed. 820 (1913), and the fact that in any event the statements were not against penal interest.

In United States v. Alexander, 139 U. S.App.D.C. 163, 430 F.2d 904 (1970), we decline to "overrule" Donnelly, the 1913 Supreme Court decision which gave the stamp of approval to the common law's refusal to recognize declarations against penal interest as exceptions to the hearsay rule. We must do so again today. The mental condition of the declarator, both normally—White was described as a chronic alcoholic, highly susceptible to leading questions, with a deteriorating, incomplete, and sporadic memory—and specifically on the night in question—highly intoxicated—when taken together with the type of statement involved, which the trial judge determined was actually not against the declarant's penal interest,[11] render highly suspect the trustworthiness of the statements and the ability of the declarant to realize that the statement was against his penal interest. The foundation of the hearsay exceptions, trustworthiness, is not the trustworthiness of transmission, but rather the trustworthiness of emission.[12] Thus, appellant's

10. United States v. Townsend, 151 F.Supp. 378 (D.D.C.1957), is distinguishable, not so much in kind as in degree. In *Townsend*, prior to the time the defendant was subjected to the test he appeared to have been bleeding profusely from facial wounds. The court was concerned both that police took no precautions to assure that the blood from the wounds was not transferred to defendant's penis, and that the bleeding was the result of police misconduct. Here, only small scratches were on appellant's face and no police misconduct occurred. The *Townsend* judge, as the trial judge in our case, properly exercised his discretionary powers.

The transcript in the present case discloses that the jury was fully aware of the propensity of the peroxidase enzyme to react positively to substances other than blood. Therefore, this case is distinguishable from any situation theorized in United States v. Smith, 152 U.S.App. D.C. 229, 470 F.2d 377 (1972).

11. We do not decide the issue of declarations against penal interest on the basis that the declaration was not of that genre, but only point to its questionable qualifications as such.

12. The *Wigmore* treatise, in a section entitled "Spurious Theories of the Hearsay Rule," states:

Occasionally there have been advanced other reasons or definitions of the Hearsay rule,—though without much emphasis, and usually as supplementary only to the orthodox theory.

(1) It has been said, for example, that hearsay assertions are to be excluded because of the *risk of incorrect*

assertion that this is an ideal situation for overruling *Donnelly* since "there is no doubt of the essential accuracy of the statements in describing what was said" is ill-taken.

For the foregoing reasons, the conviction of William Sheard is

Affirmed.

J. SKELLY WRIGHT, Circuit Judge (dissenting):

In my judgment the evidence viewed and seized as a result of the post-midnight entry by Officers Shuler and Jones into Sheard's room should be suppressed. The record in this case indicates to me that the Government has not met its burden of showing that the warrantless entry into Sheard's room by the police was clearly based on appellant's consent.

"Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." Dorman v. United States, 140 U.S.App.D.C. 313, 317, 435 F.2d 385, 389 (1970) (*en banc*). "The right of officers to thrust themselves into a home is * * * a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance." Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). *See also* Coolidge v. New Hampshire, 403 U.S. 443, 454–455, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971) (opinion of Mr. Justice Stewart); Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). No claim is made here that the police had a warrant, or even probable cause, to justify a search. Nor is there any suggestion of probable cause to arrest Sheard. Thus, as the majority agrees, the only possible legal basis for the police entry of Sheard's apartment in the circumstances

of this case was with his consent. The majority opinion argues that the trial judge's conclusion that Sheard consented to the police entry, and thus waived his Fourth Amendment right to be free of unwarranted police intrusion, should not be disturbed. I respectfully disagree.

I

In a host of cases the Supreme Court has stated again and again that a waiver of constitutional rights is not easily found. The classic test for such waiver was announced by the Supreme Court in Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938):

"* * * It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver * * * must depend, in each case, upon the particular facts and circumstances surrounding that case * * *."

(Footnotes omitted.) More recently, the Court has indicated its awareness that people are often thrust into circumstances where truly informed and voluntary waiver, while perhaps superficially apparent, may not actually occur. *See, e. g.,* Miranda v. Arizona, 384 U.S. 436, 457, 476, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In some situations where constitutional rights are, at first glance, apparently waived, police may in fact have utilized subtle coercion or capitalized on a person's terror or incomprehension arising from an unanticipated encounter with the authorities.[1] Even where clear evidence of overt coercion is absent, courts must be on their guard for what

---

*transmission* of the statements by the one reporting them.
V Wigmore on Evidence § 1363 (3rd ed. 1940).

1. *See* Brady v. United States, 397 U.S. 742, 750, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); Boykin v. Alabama, 395 U.S. 238, 242–243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

can be understood only as irrational acts of bravado by a suspect in waiving his rights and consenting to an otherwise unjustified police entry or search.[2]

In dealing with consents to search or to entry of premises protected under the Fourth Amendment, the burden is therefore rightly on government to prove "that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548, 88 S. Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). As this court said more than two decades ago:

"* * * [S]uch a waiver or consent must be proved by clear and positive testimony, and it must be established that there was no duress or coercion, actual or implied. * * * The Government must show a consent that is 'unequivocal and specific[,]' * * * 'freely and intelligently given.' * * * "

Judd v. United States, 89 U.S.App.D.C. 64, 66, 190 F.2d 649, 651 (1951). *See also* Higgins v. United States, 93 U.S. App.D.C. 340, 209 F.2d 819 (1954).

The majority does not argue that this rigorous standard for testing waiver is inappropriate. But it concludes that, since "conclusions by the trial judge as to factual matter should be given utmost deference," the trial judge's finding of consent in this case must be upheld. With respect I submit the majority has applied the wrong standard of review in this case, and application of the wrong standard of review has produced the wrong result.

Where a waiver of fundamental constitutional rights is alleged, the duty of appellate judges is *not* to show "utmost deference" to the trial judge's finding of waiver, but rather to "make an *independent* examination of the evidence in the record," Brookhart v. Janis, 384 U. S. 1, 4 n. 4, 86 S.Ct. 1245, 1247, 16 L. Ed.2d 314 (1966) (emphasis added); *see also* Blackburn v. Alabama, 361 U.S.

199, 205 n. 5, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960), and then determine whether the findings of the District Court are clearly erroneous. Jackson v. United States, 122 U.S.App.D.C. 324, 327, 353 F.2d 862, 865 (1965). My view is that the evidence in the record does not meet the requirement that consent to entry was unequivocal, specific, and freely and intelligently given. *See* Judd v. United States, *supra*.

II

As I read the record, this case appears to be practically on all fours with Johnson v. United States, *supra*. There the Government attempted to validate, on the basis of consent, a warrantless entry by police into a hotel room occupied by the defendant. Mr. Justice Jackson, writing for the majority, described the scene this way:

"* * * They knocked and a voice inside asked who was there. 'Lieutenant Belland,' was the reply. There was a slight delay, some 'shuffling or noise' in the room and then the defendant opened the door. The officer said, 'I want to talk to you a little bit.' She then, as he describes it, 'stepped back acquiescently and admitted us.' He said, 'I want to talk to you about this opium smell in the room here.' She denied that there was such a smell. Then he said, 'I want you to consider yourself under arrest because we are going to search the room.' * * , * "

333 U.S. at 12, 68 S.Ct. at 368. The Court concluded that these facts could not support a finding of consent:

"Entry to defendant's living quarters, which was the beginning of the search, was demanded under color of office. It was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right. * * * "

*Id.* at 13, 68 S.Ct. at 368.

2. *See* Judd v. United States, 89 U.S.App. D.C. 64, 66, 190 F.2d 649, 651 (1951); Note, Consent Searches: A Reappraisal

After Miranda v. Arizona, 67 Colum.L. Rev. 130, 131 (1967).

152

Here the facts are only slightly different. Officer Shuler testified that he knocked on the door and identified himself as a police officer and advised Sheard that a small child had been killed and that he and his partner, Officer Jones, would like to come inside. As to Sheard's behavior at this point, there is little firm indication as to what he actually said. At one point Officer Shuler testified that Sheard was "friendly" and had said, "Come in, come in, I'd like to do all I can to find out." Later, however, Officer Shuler testified that he did not remember exactly what Sheard had said. Officer Jones, on the other hand, testified:

"Well, he just stepped back. And I don't remember if he said, come in, but I was under the impression that we were to enter the room by his attitude."

On the basis of this police testimony, I submit, there is little to distinguish this case from *Johnson*. Entry was requested under "color of office" and it "was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right." To me, it taxes credulity to suggest that appellant here intentionally and intelligently waived his Fourth Amendment rights and invited the police into his room to see in plain view evidence that would send him to jail for murder for life. Indulging, as we must, " 'every reasonable presumption against waiver' of fundamental constitutional rights," I find it simply impossible to conclude that there was a waiver in this case.

Even if it could be held that the facts of this case support a facial claim of consent, the police conduct in gaining entry to appellant's apartment vitiated that facial consent. The record makes quite clear that the purpose of Officers Shuler and Jones in going to Sheard's apartment was not merely to talk to him further about his knowledge of the victim's whereabouts earlier that evening. Rather, they were acting on orders of a superior officer to conduct a dragnet, warrantless search, without probable cause, of the pubic area of every male in the building. And they did, in fact, conduct such a search on Sheard after entering his apartment. Yet no mention of this blatantly unlawful purpose, *see* Davis v. Mississippi, 394 U.S. 721, 89 S. Ct. 1394, 22 L.Ed.2d 676 (1969), was made when they knocked on the door. Instead, the police indicated that they meant nothing extraordinary, for the most we are told is that Officer Shuler, when he knocked, said merely, "We're police officers and * * * a small child had been killed and we'd like to come in." In reviewing a Fourth Amendment waiver finding, courts have long focused on the question of official deceit. *See* Bumper v. North Carolina, *supra*, 391 U.S. at 548–550, 88 S.Ct. 1788; Robbins v. MacKenzie, 1 Cir., 364 F.2d 45, 48–49, cert. denied, 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966); United States v. Como, 2 Cir., 340 F.2d 891, 894 (1965); *see generally* Note, Effective Consent to Search and Seizure, 113 U.Pa.L.Rev. 260, 271 (1964). In my judgment, this focus is clearly proper since it may be inferred that, had the police been straightforward about their purposes, the suspect might well have been alerted to claim his rights and to withhold consent. Moreover, under elementary principles of law consent obtained by misrepresentation is no consent at all. Thus I would find the police behavior here yet another factor compelling rejection of the trial judge's finding.

Nor do I believe that Sheard's prior contact with the police that evening in the hall of the apartment building, including the fact that he called the authorities to report the victim's absence from the apartment building, detracts from my finding. The majority argues that this prior contact and call somehow suggest that Sheard was sufficiently receptive to the police when they knocked on his door after midnight to justify a finding of consent to enter. In my view, this argument will not stand analysis. For one thing, the police, when they knocked on Sheard's door, gave no

indication that they wanted to continue their earlier conversation with him. Quite the reverse, they were cryptic, saying only that they wanted to "come inside." And, in fact, discussion was not on their minds at all, but rather an illegal search of his person, about which they even withheld warning. Certainly consent to enter obtained for an undisclosed illegal purpose cannot be construed as an intentional relinquishment of a known constitutional right. Moreover, in the circumstances of this case it strains credulity to argue that just because Sheard talked with the police earlier in the evening, he was likely to invite them into his room when they called again after midnight. In my mind, ordinary human experience dictates the reverse: most people are not used to any encounters with the police after dark and the normal human reaction to an unanticipated second visit after midnight, even for one with no consciousness of guilt, is likely to be considerable surprise and shock, not exactly the frame of mind conducive to a free, knowing and intelligent waiver.

Finally, the majority suggests that since the trial judge suppressed the direct product of the unlawful police purpose—the observation of blood on Sheard's pubic area—we must view this case as if the pubic search never occurred and was never contemplated. While this neat *post hoc* reconstruction of events has a certain logic-chopping allure, I believe it is deeply misleading. The actual purpose of the two officers in gaining entry to appellant's room is, in my view, extremely relevant to a consideration of the waiver question, although it is not necessarily central to my conclusion. It suggests, to me at least, that the atmosphere surrounding the entry—certainly a factor one must consider in judging whether there is a valid waiver—was very possibly deceptive, coercive, and not conducive to the kind of freely given and intelligent consent the Constitution requires. With the body of the child just discovered, the police were under unmistakable, flat orders to gain entry to Sheard's apartment and to check his pubic region. Although the record does not indicate the tone of voice Officer Shuler used, I believe it is blinking reality to suggest that his behavior, even at the point when he was merely knocking at the closed door, was likely to be conducive to a free choice on Sheard's part. Rather, in view of their extraordinarily illegal purposes and the doubtless emotional atmosphere in which they went to Sheard's room, the circumstances of this case compel no less than the conclusion reached by the Supreme Court in Johnson v. United States, *supra*: that the consent to entry was at most a "submission to authority rather than * * * an understanding and intentional waiver of a constitutional right." 333 U.S. at 13, 68 S.Ct. at 368.

### III

Since the police observations of Sheard, the subsequent arrest, the seizure of evidence from his room, and the administration of the benzidine test to him at the police station were all based on what I believe was an unlawful entry into his room, I would suppress all those items of evidence. Wong Sun v. United States, 371 U.S. 471, 484–487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Since there is no suggestion that the admission of this evidence at appellant's trial was not crucial to his conviction, I would reverse that conviction.

I respectfully dissent.